# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BAR ASSOCIATION<br>321 North Clark Street<br>Chicago, IL 60654,<br><br>        *Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue NW<br>Washington, D.C. 20530,<br><br>PAMELA J. BONDI, in her official capacity as<br>Attorney General<br>950 Pennsylvania Avenue NW<br>Washington, D.C. 20530,<br><br>TODD BLANCHE, in his official capacity as<br>Deputy Attorney General<br>950 Pennsylvania Avenue NW<br>Washington, D.C. 20530,<br><br>        *Defendants.* | Case No. |

## COMPLAINT

## INTRODUCTION

1.      The First Amendment guarantees rights that are basic to our system of government and to our way of life. Among these fundamental rights are the freedom of speech and the freedom to petition the government for redress.

2.      The Administrative Procedure Act prohibits government agencies from taking final agency actions that are arbitrary and capricious or otherwise contrary to law.

3.      This case seeks to enjoin the U.S. Department of Justice (DOJ), the Attorney General, and the Deputy Attorney General from trampling the First Amendment rights of the American Bar Association (ABA) and violating the Administrative Procedure Act by unlawfully terminating grants to the ABA Commission on Domestic and Sexual Violence (ABA CDSV).

4.      The ABA is the largest voluntary association of judges, lawyers, and legal professionals in the world. Its mission is to serve the legal profession and the public by defending liberty and pursuing justice.

5.      In line with this mission, and for more than a century, the ABA has had a productive partnership with DOJ. The Attorney General and DOJ officials have long played an active role in helping the ABA to support the rule of law, including by participating in ABA events and panels.

6.      For three decades, the ABA has served as a DOJ grantee. DOJ through its Office on Violence Against Women (OVW) has, since 1995, funded the ABA's training and support programs for lawyers and judges designed to increase access to justice for survivors of domestic violence and sexual assault. Congress appropriated this funding under the Violence Against Women Act (VAWA) and subsequent reauthorizations.

7.      DOJ ended the ABA's funding through these OVW grants suddenly, and without notice, earlier this month.

8.      This lawsuit is necessitated by DOJ's undisguised efforts to retaliate against the ABA for taking positions that the current Administration disfavors and for seeking judicial redress from Administration policies that contravene the Constitution and by DOJ's unlawful termination of OVW grants to the ABA.

9.      On April 9, 2025, Deputy Attorney General Todd Blanche issued a memorandum, "Engagement with the American Bar Association" (Blanche Memo),[1] to single out the ABA for its purported "support of activist causes" and its litigation against the Administration on issues "contrary to the federal government's policies." The memo takes the position that DOJ can withhold funds from the ABA as a response to DOJ's disagreements with the ABA, because DOJ must "be careful stewards of the public fisc." Therefore, to sanction the ABA for engaging in constitutionally protected activities that the Administration dislikes, the Blanche Memo imposed new and extraordinary limits on DOJ employees' engagement with the ABA.

10.     The memo prohibits DOJ employees from participating in ABA-sponsored events on official time and from undertaking even *de minimis* activities (like reading a book in DOJ's library or using small amounts of paper, *see* 5 C.F.R. § 45.4(a)) that would support ABA-sponsored publications. The memo also prohibits some DOJ employees even from renewing their personally paid-for ABA memberships.

11.     The Blanche Memo makes no secret of DOJ's intent to punish the ABA for its litigation positions, including by cutting off "taxpayer funds" to support any ABA activities. DOJ acted further on that intent a day later, when it abruptly—and without cause—terminated all of the ABA's OVW grants. Although DOJ cited a purported change in "agency priorities" as its justification, DOJ's only apparent "priorit[y]" was to punish the ABA, as other OVW grants with

---

[1] Memorandum from Deputy Att'y Gen. Todd Blanche to All Dep't Emps. (Apr. 9, 2025), https://perma.cc/P6E7-B68K.

similar aims were undisturbed. Indeed, DOJ has assured other grantees that OVW remains "committed to the success" of *their* projects—highlighting the pretextual nature of DOJ's stated reasons for terminating the ABA's grants. And the fact that two of the seven ABA grants that OVW purported to cancel had already ended by their terms underscores that the DOJ had not engaged in any grant-specific analysis of DOJ policy, let alone reasoned deliberation. Moreover, the relevant regulations do not allow for termination due to changed agency priorities.

12.    DOJ's actions are unconstitutional. The First Amendment does not permit DOJ to retaliate against the ABA for its viewpoints or for having filed a lawsuit against the federal government. DOJ's actions constitute de facto unconstitutional conditions on federal funding, in violation of the First Amendment and the Spending Clause of the U.S. Constitution. And they violate the Fifth Amendment's equal protection and due process protections and the Administrative Procedure Act.

13.    Absent this Court's intervention, Defendants' unlawful actions will cause the ABA real and immediate harm. The ABA does not have other sources of funding to replace the OVW grants, and within a few weeks, it will have to begin laying off employees dedicated to this critically important domestic violence and sexual assault work. Further, the loss of these funds will damage the ABA's reputation as a training and technical-assistance partner and will cause profound harm to other legal services providers, the justice system, and, ultimately, to the survivors of domestic and sexual violence who have come to rely on the ABA. Finally, Defendants may already be in the process of finding a replacement for the ABA's training and technical assistance role in certain grants; the obligation of the ABA's grant funds to another grantee would be another irreparable loss.

## JURISDICTION AND VENUE

14.    The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

15.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

16.    Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) and (B) because Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

17.    Plaintiff ABA is a nonpartisan organization founded in 1878, and it is the largest voluntary association of judges, lawyers, and legal professionals in the world. ABA CDSV has a mission to promote access to justice for survivors of domestic violence, sexual assault, and stalking by mobilizing the legal profession. CDSV accomplishes its mission by providing training and technical assistance to legal practitioners and adjudicators who work with survivors, as well as by collaborating with and supporting the efforts of partner organizations and advocates nationwide.

18.    Defendant U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

19.    Defendant Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

20.    Defendant Todd Blanche is the Deputy Attorney General of the United States. He is sued in his official capacity.

## BACKGROUND

I. **Congressional Appropriations for Helping Survivors of Domestic Violence and Sexual Assault**

A. **The Violence Against Women Act and Office on Violence Against Women**

21.     Thirty years ago, the enactment of the Violence Against Women Act of 1994 marked the first comprehensive federal legislative effort to address violence against women. The statute is designed to improve criminal justice responses to sexual assault, domestic violence, dating violence, and stalking, and to increase the availability of services for survivors. Congress subsequently reauthorized VAWA in 2000, 2005, 2013, and 2022, each time improving legal and community-based responses to gender-based violence.

22.     In tandem with the development and passage of that landmark legislation, the ABA launched what was then called the Commission on Domestic Violence—now ABA CDSV—as part of the ABA's Task Force on Domestic Violence. Its purpose was to "help the Association play a more active national leadership role in the enhancement of legal system reform on domestic violence." To that end, the Commission was tasked with "[m]obiliz[ing] the bar on improving the legal response to domestic violence, including implementing domestic violence-related provisions of [VAWA] and related state legislation." Through its related task force and new Commission, the ABA was thus involved in supporting and engaging on the new federal legislation and resulting programs from the start and helped shape subsequent iterations of VAWA.

23.     Among VAWA's many provisions was the creation of the Office on Violence Against Women (OVW) within DOJ. Congress tasked OVW with implementing VAWA, including the administration of the statute's grant programs. As OVW's website describes, "[t]hese grant programs are designed to develop the nation's capacity to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable." *Grant Programs*, OVW, https://perma.cc/KK99-D495 (last visited Apr. 22, 2025).

24.     OVW grants are awarded following an open application process and are extremely competitive. They generally provide funding for performance periods lasting two to three years.

25.     When a grant is awarded, OVW provides the grantee an award letter along with relevant information, including the conditions of the award and the assignment of a grant manager. Each grant agreement includes an understanding that "OVW will play a substantial role in shaping and monitoring the project."

26.     One condition of OVW grants is that grantees must submit all materials and publications, in any format, that are funded by the grants, to allow OVW to review and approve them before publication. If OVW requires changes to any submissions, those changes are communicated through the grant manager and must be implemented before publication.

27.     For each of the grants that it has previously been awarded, ABA CDSV has successfully been awarded a renewed grant upon reapplying during successive award cycles.

**B.  The Regulations Governing DOJ Grants**

28.     The Office of Management and Budget (OMB) has the authority to "establish governmentwide financial management policies for executive agencies." 31 U.S.C. §§ 503(a), 504. That includes the authority to "[p]rovide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements." *Id.* § 503(a)(2).

29.     Pursuant to that authority, in 2013, OMB published Uniform Guidance for federal financial assistance at title 2, part 200, of the Code of Federal Regulations. 78 Fed. Reg. 78,590 (Dec. 26, 2013).

30.     OMB's Uniform Guidance specifically requires federal agencies to "implement" the OMB guidance "in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106. OMB has updated its guidance twice since, in 2020, *see*

85 Fed. Reg. 49,506, and in 2024, *see* 89 Fed. Reg. 30,046, each after providing a notice-and-comment period.

31.    By regulation, DOJ has adopted the OMB guidance. *See* 2 C.F.R. § 2800.101.

32.    The OMB guidance adopted by DOJ includes specific provisions outlining remedies that agencies may have against grantees for noncompliance and identifying the circumstances in which agencies may suspend or terminate grants or withhold new awards or the continuation of funding.

33.    The OMB guidance adopted by DOJ provides that there are three circumstances in which a federal agency may terminate an award: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a).

34.    Under this regulation, a change in agency priorities is not automatically a permissible basis for terminating a grant. Rather, the terms and conditions of the award itself must specify this ground as a basis for termination. *Id.* § 200.340(b) (requiring that the agency "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). And, in adopting the regulation, OMB explained that federal agencies could terminate an award for not effectuating agency priorities "provided that the language is included in the terms and condition of the award." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024). As OMB explained, this regulation is meant to "underscor[e] the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.*

35.     Should the agency decide to terminate a grant, it "must provide written notice of termination to the recipient or subrecipient." 2 C.F.R. § 200.341(a). That written notice "should include the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." *Id.*

36.     DOJ has also issued a "DOJ Grants Financial Guide," last updated October 2024. U.S. Dep't of Justice, *DOJ Grants Financial Guide*, https://perma.cc/TT35-JMSF (last updated Oct. 2024). This guide "serves as the primary reference manual to assist" OVW grantees (among others) "in fulfilling their fiduciary responsibility to safeguard grant funds and ensure funds are used for the purposes for which they were awarded." The guide notes, however, that grantees "should refer to their award terms and conditions to determine the specific requirements that apply to their award." *Id.*

37.     As to termination, DOJ's guide echoes the OMB guidance and provides that "[p]ursuant to 2 C.F.R. § 200.340, a Federal award may be terminated in part or in its entirety by the DOJ awarding agency" either (1) "for failure to comply with the terms and conditions of an award," (2) "with consent of the recipient or subrecipient, in which case the two parties must agree upon termination conditions," or (3) "pursuant to the terms and conditions of the Federal award including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

38.     DOJ's guide states that these requirements "apply to Federal awards active on or after October 1, 2024 (with respect to actions after that date)."

## II.  The ABA and Its Commission on Domestic and Sexual Violence

### A.  The Work and Impact of ABA CDSV

39.     Since 1994, ABA CDSV has mobilized and educated the legal profession to increase access to justice for survivors of domestic violence, sexual assault, and stalking. It accomplishes this

by providing training and technical assistance to legal practitioners and adjudicators who work with survivors, as well as by collaborating with and supporting the efforts of partner organizations and advocates nationwide. Based on its decades of experience, its reliability as a partner in this work, and the excellence of the programming and assistance it provides, ABA CDSV has become a go-to resource for legal service providers working with clients who are survivors, and, on certain topics, it is the best organization available as a resource for information and assistance to lawyers in this field.

40.     ABA CDSV is widely recognized as a leader in training and technical assistance for legal professionals working with survivors. OVW has awarded ABA CDSV multiple training and technical assistance grants for nearly 30 years, and it has routinely recognized the excellence of ABA CDSV's work. For example, in an email last year, one OVW grant manager praised a training guide ABA CDSV developed as "a tremendous resource—comprehensive, accessible, and well-written." It is no surprise, therefore, that ABA CDSV has consistently been awarded renewed grants through the competitive application process during successive award cycles.

41.     In addition to its trainings and technical services, ABA CDSV has—with support from OVW funding—previously published several key standards of practice for attorneys representing survivors of domestic violence, as well as many other resources, which continue to be invaluable to OVW grantees and lawyers across the country who work with survivors.

42.     ABA CDSV's trainings and assistance are imperative for the legal professionals they support. Working with clients who are survivors of domestic violence and sexual assault requires particular knowledge and skills that generally are not learned in law school—for example, how to work with traumatized individuals and effectively cross-examine abusers. To fill this gap, ABA CDSV has developed best practices to successfully equip legal practitioners in this space with the necessary tools and the ability to do their difficult work effectively without burning themselves out. All of its grant-funded projects involve hands-on trainings that allow lawyers to put their new

knowledge and skills into practice and provide a space for them to make mistakes and receive constructive feedback. Without that training, these legal professionals would be learning as they go, without specialized knowledge on how to engage with clients who are survivors, in situations where lives are often on the line. ABA CDSV's work therefore has a significant, concrete effect on the domestic and sexual violence survivors who are helped by the attorneys who use ABA CDSV's training and technical assistance.

43.    ABA CDSV has never been found to be in noncompliance with the conditions of any grant awards and has never previously had a grant suspended or terminated. To the contrary, because of ABA CDSV's deep experience and consistently excellent execution, OVW continually looks to ABA CDSV as a resource for advice, collaboration, and support. For example, ABA CDSV regularly provides input on new OVW grant programs, as ABA CDSV's work allows it to identify areas of need for new grant programs. In addition, ABA CDSV acts as a partner to OVW for trainings it holds for award recipients at the start of each new grant cycle. ABA CDSV coordinates and helps plan those trainings, assists in developing the curricula for new grantees, and hosts several of its own training sessions.

44.    To support its work on OVW grant projects, ABA CDSV currently employs seven full-time staff members. Five of those staff are entirely or mostly funded by OVW grant money. In addition to managing the grant applications, funds, and conditions, ABA CDSV staff create curricula, develop training plans, establish relationships with partners, facilitate the trainings, and field frequent requests for assistance on demand.

45.    The termination of all of ABA CDSV's grants has immediate and devastating effects for ABA CDSV's staff, its partners, legal services providers across the country who rely on ABA CDSV's services, and, ultimately, survivors of domestic and sexual violence who require knowledgeable and skilled advocacy and representation.

**B.  ABA CDSV's Current Projects and OVW Funding**

46.     Before the terminations, ABA CDSV had five active OVW grants totaling $3.2 million, which make up almost the entirety of ABA CDSV's current funding.

47.     First, the Civil Litigation Skills Project offers intensive, victim-centered, skills-building training to civil attorneys who represent gender-based violence survivors. It provides these attorneys with emerging information, specialized skills, tools, and resources to help them improve in their practice, both in their interactions with their clients and in their representation of and advocacy for them. It also connects these attorneys with on-demand individualized assistance, referrals, and consultation. Through this project, in addition to ad hoc support, ABA CDSV provides at least four trainings each year focused on custody litigation and trial skills, at beginner, intermediate, and advanced levels.

48.     The Civil Litigation Skills Project, which has existed in some form for more than 25 years, was most recently funded by a $1,000,000 award from DOJ's OVW for October 1, 2022, through September 30, 2025.

49.     Second, the Trauma-Informed Representation Project equips legal services providers to offer trauma-informed and client-centered representation. Trauma-informed representation is grounded in a commitment to survivor safety, choice, collaboration, and empowerment and is foundational for effective and ethical legal services. At the same time, gender-based violence attorneys experience secondary or vicarious trauma at significantly high rates. This project addresses an urgent need to recognize and counter the traumas both survivors and providers endure.

50.     OVW awarded $600,000 for the Trauma-Informed Representation Project, for October 1, 2022, through September 30, 2025.

51.     Third, through the LGBTQI+ Legal Access Project, ABA CDSV provides individualized support, training, and technical assistance to address domestic and sexual violence in

LGBTQI+ communities specifically. This project is designed to tackle obstacles survivors in that community face to accessing legal services, law enforcement resources, and adequate protection in family courts—obstacles which often prevent them from seeking and obtaining protection under the law. ABA CDSV accomplishes this through trainings provided primarily to legal services organizations, prosecutors, and judges.

52.     Most recently, OVW awarded $450,000 for the LGBTQI+ Legal Access Project for October 1, 2024, through September 30, 2027.

53.     Fourth, to train coalitions to address the difficulties faced by LGBTQI+ victims as described above, ABA CDSV also developed the LGBTQI+ Training for Coalitions Project. The grant underlying this project provides for training and technical assistance to state and territorial coalitions on the needs of LGBTQ+ survivors.

54.     The current grant award for the LGBTQI+ Training for Coalitions Project totals $400,000 for October 1, 2024, through September 30, 2027.

55.     Fifth, ABA CDSV has created an important new project pursuant to OVW's Expanding Legal Services Initiative (ELSI). In creating this brand-new initiative, OVW had awarded eight community organizations ELSI grants. After the competitive application process, ABA CDSV was chosen to provide the training and technical assistance necessary to educate and support those eight new grantees, to enable them to stand up legal services programs within their own organizations.

56.     OVW awarded ABA CDSV $750,000 for this inaugural ELSI grant, to be performed from October 1, 2023, through September 20, 2026.

57.     In addition to those five, two other grants that DOJ purported to terminate had already ended on March 31, 2025, and were already in the closeout period.

58.     Each grant award constitutes a cooperative agreement and includes detailed
information, including the award conditions, which are consistent across ABA CDSV's grants.
Those conditions state that a failure to comply with award requirements may result in OVW "taking
appropriate action," including that it may "withhold award funds, disallow costs, or suspend or
terminate the award." The conditions provide that the requirements of 2 C.F.R. part 200, as adopted
by DOJ, apply to the grant awards. They further provide that OVW may terminate or suspend the
award if ABA CDSV fails to comply with applicable laws, regulations, and conditions; fails to "make
satisfactory progress toward the goals, objectives, or strategies" of the award; or has proposed or
implemented project changes that, "if originally submitted, the application would not have been
selected." Such termination or suspension is governed by 2 C.F.R. § 200.340 and will last until OVW
"is satisfied that there is no longer such failure or changes."

### III. The Department of Justice's Targeted Retaliatory Actions against the ABA

#### A.  The Administration's Animus Towards the ABA

59.     Founded in the same decade more than a century ago, DOJ and the ABA have long
enjoyed a positive, collaborative relationship. Both entities historically shared the established goals of
pursuing justice and advancing the rule of law. That relationship has evolved throughout the years,
but there has never been a time when DOJ—much less the broader Administration—has treated the
ABA with open hostility. The current Administration, however, quickly retaliated against the ABA.

60.     On February 10, 2025, the ABA issued a statement condemning "recent remarks of
high-ranking officials of the administration that appear to question the legitimacy of judicial review,"
including by suggesting that it is optional for the government to comply with court orders or by
targeting specific judges who have issued rulings with which the government disagrees.[2] The ABA

---

[2] *ABA condemns remarks questioning legitimacy of courts and judicial review*, Am. Bar Ass'n (Feb. 11, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/02/aba-statement-re-remarks-questioning-judicial-review.

expressed concern that such comments "pose serious risks to our constitutional framework that separates power among three co-equal branches." It thus called on lawyers and legal organizations to "condemn the efforts of any administration that suggests its actions are beyond the reach of judicial review." In the face of such "a clear and present challenge to our democracy and the separation of powers," the ABA renewed its commitment to "stand for the rule of law today as [it has] for nearly 150 years."

61.     The following day, the ABA, along with other affected organizations, filed a lawsuit challenging the Administration's freezing of grant funding for international development from the U.S. Agency for International Development (USAID) and the Department of State, including tens of millions of dollars in grants awarded to the ABA.

62.     On March 3, 2025, the ABA issued a statement that it "rejects efforts to undermine the courts and the legal profession."[3] It observed that, in the three weeks since its February 11 statement, "government actions evidence a clear and disconcerting pattern" of targeting judges who issue "decision[s] this administration does not agree with" and lawyers who represent parties with positions adverse to the Administration. The ABA denounced the Administration's—and particularly DOJ's—actions targeting legal professionals, including prominent law firms. The ABA acknowledged the risks but stated that it had "chosen to stand and speak" and called upon others in the entire legal profession to join them in "speak[ing] out against intimidation."

63.     On March 26, 2025, more than 100 bar organizations issued a joint statement with the ABA, reinforcing the need to "stand for the rule of law and the values we hold dear" and again

---

[3] *The ABA rejects efforts to undermine the courts and the legal profession*, Am. Bar Ass'n (Mar. 3, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/03/aba-rejects-efforts-to-undermine-courts-and-legal-profession.

rejecting "the notion that the U.S. government can punish lawyers and law firms who represent certain clients or punish judges who rule certain ways."[4]

### B. The Department of Justice's Memo Retaliating Against ABA

64.    To retaliate against the ABA, DOJ issued the Blanche Memo to all of its employees on April 9, 2025, seeking to significantly limit employees' "engagement with" the ABA.[5] The memo decries the ABA's constitutionally protected actions, including the filing of a lawsuit against the government and taking positions that DOJ views as "contrary to the federal government's policies" and "not aligned with the positions advanced by the Department of Justice." It specifically calls out the ABA's support for what DOJ deems "activist causes," including by filing amicus briefs "arguing against . . . regulation of abortion," "endorsing the consideration of race in admissions policies," and "supporting [an] effort to compel speech inconsistent with a citizen's religious belief." And the memo suggests that engagement with the ABA—despite its established mission of defending liberty and delivering justice, and long history of carrying out that mission, including alongside DOJ—is contrary to DOJ's "core mission of administering justice in a fair, effective, and even-handed manner."

65.    Pursuant to DOJ's unfounded view that the ABA operates contrary to DOJ's "core Constitutional mission," the Blanche Memo sets out an unprecedented policy of retaliation. Per the memo, DOJ "will no longer use taxpayer funds to pay for any travel to or engagement with ABA events" and prohibits all employees from "speak[ing] at, attend[ing], or otherwise participat[ing] in events hosted by the ABA" in their official capacities. It further bans employees from "participat[ing] in ABA-sponsored events on official time." And it prohibits employees from using a

---

[4] Am. Bar Ass'n *et al.*, *Bar Organizations' Statement in Support of the Rule of Law*, Am. Bar Ass'n (Mar. 26, 2025), https://www.americanbar.org/news/abanews/aba-news-archives/2025/03/bar-organizations-statement-in-support-of-rule-of-law.
[5] Memorandum from Deputy Att'y Gen. Todd Blanche to All Dep't Emps. (Apr. 9, 2025), https://perma.cc/P6E7-B68K.

"government computer, phone, internet access, or database access to assist . . . in preparing any written or spoken materials for ABA publication."

66.     The Blanche Memo goes further. It dramatically restricts certain employees from engaging with the ABA even in their personal capacities and on personal time. In particular, the memo entirely bars "policy employees"—a category including not just political appointees but also career employees deemed to "serve in policy-determining, policymaking, or policy-advocating positions"—from "hold[ing] leadership positions in the ABA or renew[ing] any existing memberships." And it bars policy employees from "any participation in ABA events" and from "writ[ing], speak[ing], or otherwise publish[ing] materials in ABA-sponsored media of any kind" unless they first obtain "specific approval" from both their component head and the Deputy Attorney General himself.

67.     As to "non-policy employees," the memo specifically excludes ABA-related activities from the generally applicable "*de minimis* personal use exception for the use of Department property or resources" provided in 5 C.F.R. § 2635.704 and 28 C.F.R. § 45.4. This withdraws—for ABA-related activities and ABA-related activities only—the longstanding permission employees have had to use DOJ resources (such as computers, phones, internet access, and database access) for personal purposes where that use involves only negligible expense (e.g., using their work computer to register for an ABA continuing legal education training).

### C.  The Department of Justice's Abrupt Termination of All of ABA CDSV's Grants

68.     The day after DOJ issued its memo targeting the ABA, DOJ terminated all of ABA CDSV's grants. This retaliatory action cut off ABA CDSV from all of its OVW funding, which constitutes nearly all of its operating budget, and it thus abruptly halted ABA CDSV's important work.

69.    The cancellation of the grants did not arise out of the ordinary course of interactions between ABA CDSV and OVW. To the contrary, despite DOJ's growing discontent over positions taken by other parts of the ABA, ABA CDSV was able to continue its work uninterrupted for the first few months of the administration. In the days, and even hours, leading up to the termination of ABA CDSV's grants, ABA CDSV staff members and OVW grant managers engaged in regular communications about ordinary grant topics. OVW reviewed and approved ABA CDSV materials and budgets for future training programs. OVW grant managers did not state or suggest that ABA CDSV was not compliant with any terms of its grant awards, nor did OVW give ABA CDSV any reason to believe that the termination of all of its grants was imminent.

70.    Then, in a letter addressed to the ABA Director of Grant Operations and Compliance dated April 10, 2025, the OVW Deputy Director for Grants Management and Development wrote that DOJ was "hereby terminating the seven [ABA CDSV] awards to the American Bar Association." The terminations were "effective immediately" and cancelled "all unobligated balances remaining on the seven above-referenced awards."[6]

71.    The reason for the terminations was both vague and pretextual: the letter stated that "[t]hese seven awards are being terminated because a Department review of them has concluded that they 'no longer effectuate[] the . . . agency priorities.' 2 C.F.R. § 200.340(a)(4)."

72.    The letter provided no additional explanation, nor did it provide any opportunity to challenge the termination decision.

73.    None of ABA CDSV's grant awards state that the grant may be terminated based on a change in agency priorities.

---

[6] Although DOJ's termination letter purported to cancel seven grants, the performance periods for two of those grants had already ended, as of March 31, 2025.

74.     In any event, the claim of a change in agency priorities is pretextual. Although every one of ABA CDSV's OVW grants has been terminated, other OVW grantees doing similar work have been treated quite differently. ABA CDSV understands that DOJ has not terminated funding for *any* other grantee working on OVW grant projects. To the contrary, some other grantees have been reassured that their similar grants will not be canceled and that DOJ remains committed to undertaking projects substantially similar to those previously handled by ABA CDSV.

## IV. The Irreparable Harm to the ABA from the Department of Justice's Unlawful Retaliation

75.     The termination of ABA CDSV's grants has immediate and devastating effects on ABA CDSV and its partners.

76.     Most urgently, because ABA CDSV's staff is funded primarily by the grants, ABA CDSV will have no choice but to lay off most or all of its staff members in the coming weeks absent funding.

77.     As a nonprofit corporation, the ABA has no budgetary cushion or other source of funds available to save ABA CDSV and its critical work from this catastrophe. The ABA overall has lost nearly $69 million in obligated federal grant and cooperative-agreement funds. In addition, federal agencies also terminated or opted not to renew a number of federal contracts from which the ABA expected to continue to receive significant funding. Those losses of federal funding have resulted in the ABA's having to lay off more than 300 staff members and field officers across its programs. It could not reallocate funds for ABA CDSV without further reducing resources for other programs and, in turn, putting those programs at risk. And without OVW grants to ABA CDSV, this important branch of the ABA's work will be lost.

78.     Without staff or funds, ABA CDSV cannot run trainings or provide assistance. Nearly 650 individuals have registered for ABA CDSV trainings that had been scheduled in the coming weeks and months, but those—and all future trainings—will have to be cancelled if ABA

CDSV's grants are not quickly reinstated. Legal services providers and court staff working with survivors of domestic and sexual violence will have nowhere else to go to gain critical skills or to access ad hoc support that they need to interact with and represent their clients effectively. Survivors will not get the kind of representation they require. Without effective representation, lives could be damaged and lost.

79.    ABA CDSV's partners will likewise be harmed in numerous ways. They will not receive the portion of the grant funds awarded to ABA CDSV that were earmarked for them pursuant to the grant awards. The partners will also have to terminate employees. And, without the funding, ABA CDSV's partners will not have the financial means to continue the joint projects, which will simply have to end. Nor will ABA CDSV's partners be able to refer legal services providers to ABA CDSV for on-demand assistance. The harm to ABA CDSV's partnerships will, in turn, create irreparable harm to ABA CDSV's hard-earned reputation as a leader in its field and one of the most experienced and effective organizations to partner with on these issues. Notwithstanding ABA CDSV's unparalleled experience and expertise, if its funding is not reinstated with dispatch, its partners will have no choice but to discontinue their previously positive and effective working relationships with ABA CDSV. In that event, even if funds are eventually reinstated, ABA CDSV may be viewed as an unreliable partner.

80.    Moreover, ABA CDSV has reason to believe that if ABA CDSV's grant funding is not reinstated, DOJ may repurpose at least some of those funds to a different entity. If the grant funds to which ABA CDSV is entitled are obligated elsewhere, ABA CDSV will not be able to get its awards reinstated. The resulting harms would therefore continue to ripple through legal services providers who rely on ABA CDSV's work in serving their clients.

81. The destruction of ABA CDSV's critical work would be devastating for legal services providers, the justice system, and, ultimately, survivors of domestic and sexual violence across the country.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the First Amendment – Retaliation for Protected Activity

82. The paragraphs above are incorporated and reasserted as if fully set forth here.

83. The First Amendment guarantees a right to "freedom of speech" and "to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition includes the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."); *Smith v. Arkansas State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) (a person can "speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so"). "[R]eprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up). "[T]he law is settled" on this issue. *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2024) (Alito, J., concurring) (quoting *Hartman*, 547 U.S. at 256).

84. The grant terminations by DOJ's OVW violate the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity. Those actions retaliate against the ABA for engaging in speech that the government disfavors and for petitioning for judicial relief adverse to the government.

85.    The Blanche Memo identifies various ways in which the ABA had engaged in speech and petitioning—including by supporting "activist causes," taking positions "not aligned with" DOJ's, and filing suit to challenge the termination of the ABA's federal funding for foreign-assistance projects—and punishes the ABA for that First Amendment activity.

86.    The Blanche Memo openly states that, because of the ABA's speech and petitioning in those matters, DOJ is adopting a new Department-wide policy governing engagement with the ABA—a policy specifically designed to deprive the ABA of funding.

87.    The day after issuance of the memo, and in retaliation for the ABA's speech and petitioning, DOJ terminated ABA CDSV's grants, effective immediately.

88.    The grant terminations are "sufficiently adverse . . . to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Indeed, these retaliatory actions by Defendants would "deter a person of ordinary firmness in [the ABA's] position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

89.    Defendants' First Amendment violations have caused and will cause the ABA ongoing and irreparable harm. The ABA's freedom of speech and right to petition the government, in court and otherwise, are being significantly impaired. And the termination of ABA CDSV's grants will force the ABA to terminate numerous employees and shutter ABA CDSV within weeks.

## COUNT II

### Violation of First Amendment – Viewpoint Discrimination

90.    The paragraphs above are incorporated and reasserted as if fully set forth here.

91.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."

*Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 706 (2010) (Alito, J., dissenting) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate." (cleaned up)). Viewpoint-based punishments are particularly pernicious in the context of legal advocacy because they "threaten[] severe impairment of the judicial function," which depends on an "informed, independent bar." *Velazquez*, 531 U.S. at 545–46.

92.     DOJ's grant terminations violate the First Amendment's prohibition on viewpoint discrimination. The Blanche Memo ascribes several viewpoints to the ABA—including taking positions "not aligned with" DOJ's positions and supporting "activist causes" in amicus briefs—and the grant terminations are part of the punishment.

93.     The day after issuing the Blanche Memo, DOJ terminated all OVW grants to ABA CDSV, effective immediately, notwithstanding ABA CDSV's positive and collaborative relationship with OVW since the office's inception. The termination letter stated that DOJ was terminating the grants because they "no longer effectuate[] . . . agency priorities." DOJ staff, however, has indicated that at least some of ABA CDSV's work will continue through some other means but without ABA CDSV's involvement. This undermines any claim that the activities funded by the ABA's grants are no longer consistent with "agency priorities."

94.     Instead, it demonstrates that DOJ'S "priority[]" is to eliminate the ABA's role because of viewpoints the government disfavors.

95.     Because Defendants' actions amount to viewpoint discrimination, strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168–71 (2015). The grant terminations may be sustained "only if the government proves" that those actions are "narrowly tailored to serve compelling state interests." *Id.* at 163.

96.    The termination of ABA CDSV's grants does not meet that demanding test. There is no compelling interest in punishing an organization for, or chilling it from, advancing views with which the government disagrees. On the contrary, there is a compelling interest in *permitting* organizations to present to courts views contrary to the government's. *See Velazquez,* 531 U.S. at 545–48. Nor is there a compelling interest in selectively withholding from an entity government resources based on that entity's viewpoint. And Defendants have not articulated a compelling interest.

97.    Even if there were a compelling interest at stake, the grant terminations are not narrowly tailored to advancing that interest because they terminate all OVW grants to ABA CDSV without any connection to any government interest.

98.    As explained above, Defendants' First Amendment violations have caused and will cause the ABA ongoing and irreparable harm.

## COUNT III

### Violation of the First Amendment and Spending Power – Unconstitutional Conditions on Government Grants

99.    The paragraphs above are incorporated and reasserted as if fully set forth here.

100.    When the government funds an activity pursuant to the legislative branch's spending power, *see* U.S. Const. art. I, § 8, the government cannot "leverage funding to regulate speech outside the contours of the federal program itself," *USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). The government also may not "deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

101.    The termination of ABA CDSV's grants effectively seeks to create a new condition of government grants—that the grantee may not engage in speech or petitioning activity that the government disfavors. That is an unconstitutional condition that burdens the First Amendment

rights to free speech and to petition the government and is wholly unrelated to the federal program itself.

102.    As explained above, Defendants' unconstitutional conditions on federal grants have caused and will cause the ABA ongoing and irreparable harm.

## COUNT IV

### Violation of the Fifth Amendment – Equal Protection

103.    The paragraphs above are incorporated and reasserted as if fully set forth here.

104.    The termination of ABA CDSV's grants violates the Equal Protection Clause as incorporated by the Fifth Amendment, which prohibits the federal government, its agencies, its officials, and its employees from denying persons the equal protection of the laws. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

105.    The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,'" including both where the affected class has a single member and where it consists of a group of disfavored parties. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations omitted). Such a claim requires the plaintiff to allege (a) that it "has been intentionally treated differently from others similarly situated" and (b) "that there is no rational basis for the difference in treatment." *Id.* Further, when the differential treatment burdens a plaintiff's First Amendment activity, a standard "appreciably more stringent than 'minimum rationality'" governs. *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988).

106.    To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *e.g.*, *U.S. Dep't of Agriculture v. Moreno*, 413

U.S. 528, 535 (1973)). "[A] bare . . . desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne*, 473 U.S. at 447.

107.    The termination of ABA CDSV's grants violates those equal-protection principles because its purpose is to discriminate against the ABA. The targeted nature of the treatment is apparent on the face of the Blanche Memo, which singles out the ABA, airs DOJ's disagreements with the organization, and assigns specific sanctions to the organization. Countless other similarly situated organizations have not been subject to the same, or even similar, sanctions. The different treatment alone demonstrates that the memo was motivated by a bare intent to punish the ABA. The termination of ABA CDSV's grants promptly followed that memo. The ABA's understanding is that DOJ has not cancelled any of the dozens of OVW grants awarded to other entities, and DOJ staff has indicated that at least part of ABA CDSV's work will continue in some form but without ABA CDSV's involvement.. This different treatment demonstrates that the termination of the grants was motivated by a bare intent to punish the ABA.

108.    No credible, rational justification exists for treating the ABA differently than similarly situated organizations. The termination letter's stated reason—that the grants do not effectuate agency priorities—is belied by the DOJ's disparate treatment of similarly situated grantees. DOJ targeted only the ABA's grants for termination and had singled out only the ABA for its viewpoints and advocacy the day before. Defendants' true motive was to punish the ABA for engaging in activity that Defendants dislike.

109.    As explained above, Defendants' violations of the Fifth Amendment have caused and will cause the ABA ongoing and irreparable harm.

## COUNT V

### Violation of the Fifth Amendment – Procedural Due Process

110.    The paragraphs above are incorporated and reasserted as if fully set forth here.

111.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

112.    A "property" interest protected by the Due Process Clause arises where a person has a "legitimate claim of entitlement" to something. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). A property interest is created by "an independent source," such as other laws or regulations, "that secure certain benefits and that support claims of entitlement to those benefits." *Id.* A property right arises where governing law provides that the government may not terminate a benefit except for cause. *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (holding that "a property interest exists" where benefit (there, federal employment) could be terminated "only for cause").

113.    The ABA has a protected property interest in ABA CDSV's grants and the payments due under them. The applicable regulation and grant agreements do not permit DOJ to terminate the grants at their discretion but rather permit termination only in certain circumstances. In particular, all five ABA CDSV grants authorize DOJ to terminate the award in only three circumstances: (1) if there has been a "substantial failure" by ABA CDSV "to comply with applicable laws, regulations, and/or the terms and conditions of the award or relevant solicitation"; (2) if ABA CDSV has failed "to make satisfactory progress" toward program goals; or (3) if ABA CDSV has proposed or implemented "project changes" such that, if they had been submitted originally, "the application would not have been selected for funding."

114.    By providing that the grants may not be terminated except for specified causes, the grant agreements give rise to property interests protected by the Due Process Clause.

115.    The ABA did not receive prior notice before the Department summarily terminated its grants and ceased disbursing funds owed on them. Nor did Defendants provide the ABA with an

opportunity to challenge the termination of the grants before, or even after, the Department terminated them.

116.    No compelling government interest justifies Defendants' violation of the ABA's due process rights. The decision to terminate ABA CDSV's grants was based on improper purposes. Among other improper purposes, the grants were terminated for retaliatory reasons that could not justify the deprivation of any aspect of due process, let alone justify the deprivation of any due process.

117.    As explained above, Defendants' violation of the Due Process Clause has caused and will cause the ABA ongoing and irreparable harm.

## COUNT VI

### Violation of the Administrative Procedure Act

118.    The paragraphs above are incorporated and reasserted as if fully set forth here.

119.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.§ 706(2)(A)–(C).

120.    An agency action is reviewable under the APA if it is a final agency action—that is, one that "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

121.    The termination of ABA CDSV's grants is final agency action reviewable under 5 U.S.C. § 704. The termination letter marks the consummation of DOJ's decision-making and specifies that the grants are terminated "effective immediately." The termination letter eliminates the

ABA CDSV's right to continued funding under the grants, and it gives rise to legal consequences by, among other things, imposing closeout obligations on ABA CDSV.

122.    The termination of ABA CDSV's grants is contrary to constitutional right because, as explained above, it violates the ABA's First Amendment rights.

123.    The termination of ABA CDSV's grants is contrary to law because 2 C.F.R. § 200.340(a), as adopted by DOJ at 2 C.F.R. § 2800.101, authorizes an agency to terminate a federal award in only certain enumerated circumstances, none of which exists here. In particular, the regulation permits termination if the grantee "fails to comply with the terms and conditions" of the award, if the grantee consents, or "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if [the] award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340. ABA CDSV neither consented nor failed to comply with award terms and conditions. Nor did DOJ identify any way in which the terminations were "pursuant to the terms and conditions" of the awards.

124.    Instead, the termination letter stated that ABA CDSV's grants were being terminated because DOJ had concluded that they "no longer effectuate[] . . . agency priorities." But the regulation permits terminating an award on that basis only if specifically permitted by the terms and conditions of the award. The grants here do not permit termination on the basis of "agency priorities," and DOJ's termination therefore violates the applicable regulation.

125.    The termination of ABA CDSV's grants is also arbitrary and capricious for a number of reasons. It is substantively unreasonable because its purpose is to retaliate against the ABA for its First Amendment activity. The terminations also are not reasonably explained. Defendants did not articulate an adequate, reasoned, or lawful basis for it. And DOJ also failed to consider ABA CDSV's reliance interests, or the impact that withdrawing its funding would have on ABA CDSV's

partners, the legal services providers it works with, and the survivors of domestic and sexual violence who ultimately benefit from ABA CDSV's work.

126.    As explained above, Defendants' termination of the grants in violation of the Administrative Procedure Act has caused and will cause the ABA ongoing and irreparable harm.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court enter the following relief:

A.  Declare that the termination of ABA CDSV's grants is unlawful and null and void and set the termination of the grants aside.

B.  Grant preliminary and permanent injunctive relief barring Defendants from enforcing or otherwise giving effect to the termination of ABA CDSV's grants, including through the enforcement of closeout obligations.

C.  Grant preliminary and permanent injunctive relief barring Defendants from re-obligating funds used to support ABA CDSV's terminated grants.

D.  Stay the termination of the grants pursuant to 5 U.S.C. § 705.

E.  Enter an order in exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that DOJ disburses funds on ABA CDSV's grants in the customary manner and in customary timeframes.

F.  Award Plaintiff its costs, reasonable attorney's fees, and other disbursements as appropriate.

G.  Grant such other relief as the Court deems just and proper.

April 23, 2025                             Respectfully submitted,

                                          /s/ Brian Netter
                                          Brian Netter (D.C. Bar No. 979362)
                                          Christine L. Coogle (D.C. Bar No. 1738913)*
                                          Pooja A. Boisture (NY Bar No. 5104559)**^
                                          Kristin Bateman (CA Bar No. 270913)*^^
                                          Josephine T. Morse (D.C. Bar No. 1531317)*
                                          Skye L. Perryman (D.C. Bar No. 984573)

                                          DEMOCRACY FORWARD FOUNDATION
                                          P.O. Box 34553
                                          Washington, D.C. 20043
                                          (202) 448-9090
                                          bnetter@democracyforward.org
                                          ccoogle@democracyforward.org
                                          pboisture@democracyforward.org
                                          kbateman@democracyforward.org
                                          jmorse@democracyforward.org
                                          sperryman@democracyforward.org

                                          *Counsel for Plaintiff*

* *Full Admission Pending*
** *Pro Hac Vice forthcoming*
^ *Admitted only in New York; practice supervised by members of the D.C. bar*
^^ *Admitted only in California; practice supervised by members of the D.C. bar*