**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN BAR ASSOCIATION,

        *Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE *et al.,*

        *Defendants.*

Case No. 25-cv-1263-CRC

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER OR,
IN THE ALTERNATIVE, PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.    Factual Background.......................................................................................................... 3

       A.    The ABA and its Commission on Domestic & Sexual Violence.................................... 3

       B.    DOJ issues the Blanche Memo retaliating against the ABA for its speech and advocacy ........................................................................................................... 5

       C.    DOJ terminates all of ABA CDSV's grants ...................................................... 6

       D.    The grant terminations are causing irreparable harm........................................ 8

II.    Regulatory Background ................................................................................................... 9

LEGAL STANDARD ............................................................................................................. 10

ARGUMENT ......................................................................................................................... 11

I.    The ABA Is Likely to Succeed on the Merits ................................................................ 11

       A.    The grant terminations violate the First Amendment .................................... 11

           1.    The terminations are unconstitutional retaliation ............................ 11

           2.    The terminations are unconstitutional viewpoint discrimination................... 15

       B.    The grant terminations violate the APA ........................................................ 16

           1.    The terminations are final agency action........................................... 16

           2.    The terminations are contrary to constitutional right ....................... 17

           3.    The terminations are contrary to law ............................................... 17

           4.    The terminations are arbitrary and capricious ................................. 18

II.    The ABA Will Suffer Immediate and Irreparable Harm Absent Immediate Relief ............... 21

III.    The Equitable Factors Strongly Favor Emergency Relief ........................................... 23

CONCLUSION ..................................................................................................................... 24

## INTRODUCTION

The Department of Justice (DOJ) issued a memorandum announcing a new policy not to "expend tax dollars" in ways that could benefit the American Bar Association (ABA) even trivially. The memorandum stated that the new policy was a result of the ABA's having filed a lawsuit against the federal government and having advanced viewpoints that the current Administration disfavors. The next day, DOJ abruptly terminated every one of the ABA's grants from DOJ's Office on Violence Against Women (OVW). The grant terminations were targeted—all of ABA's OVW grants were terminated, regardless of their terms or objectives, while other grantees doing similar work were reassured that their work would not be affected. The ABA's grants are the principal source of funding of the ABA Commission on Domestic & Sexual Violence (CDSV), which came into existence in tandem with DOJ's OVW almost 30 years ago and has been aligned with OVW's goals and priorities from the start. Although DOJ cited a purported change in "agency priorities" as its justification for terminating ABA CDSV's grants, that purported justification was mere pretext for retaliation against the ABA's First Amendment–protected activities and was also in violation of DOJ's own grant regulations.

This adverse action by DOJ necessitates emergency relief from this Court. The termination of ABA CDSV's grants is causing immediate irreparable harm. DOJ is violating the ABA's First Amendment rights—a per se irreparable harm that alone demands preliminary injunctive relief. If the grants are not reinstated, ABA CDSV—which has no other source of funding to replace its DOJ grants—will have to begin laying off staff within a few weeks, and it will have to wind down its operations in about a month. And DOJ may already be in the process of finding a replacement for ABA CDSV's role in at least one grant. As D.C. Circuit precedent makes clear, the risk that the ABA's grant funds could be obligated to another grantee would be another irreparable loss that this Court should intervene now to prevent.

The ABA is likely to succeed on the merits. The sudden termination of ABA CDSV's grants by DOJ is unlawful in numerous ways. Mostly glaringly, it constitutes retaliation against the ABA for its speech and petitioning activities in violation of the First Amendment. DOJ's memorandum makes explicit its intent to penalize the ABA for its speech and litigation positions—blatant retaliation for First Amendment conduct that DOJ continued to carry out by terminating ABA CDSV's grants. And for the same reasons that DOJ made explicit, the grant terminations reflect unconstitutional viewpoint discrimination.

The terminations also violate the Administrative Procedure Act, because they constitute final agency action that is contrary to constitutional rights, contrary to law, and arbitrary and capricious. In addition to violating DOJ's own regulations, the notice of termination did not articulate an adequate, reasoned, or lawful basis for the action, and DOJ failed to consider the significant reliance interests of ABA CDSV and its partners.

The equitable factors strongly favor relief as well. Without funding or staff, ABA CDSV will no longer be able to provide its critically important support to help survivors of domestic and sexual violence, threatening ABA CDSV's continued existence and harming its reputation, its partners who have come to rely on ABA CDSV's expertise and support, and—ultimately—the survivors who will not get the representation they need and deserve without the services ABA CDSV provides.

The Court should enter a temporary restraining order, or alternatively a preliminary injunction, to block DOJ's unlawful termination of ABA CDSV's grants and require DOJ to immediately resume disbursing the funding awarded to the ABA.

# BACKGROUND

## I.  Factual Background

### A.  The ABA and its Commission on Domestic & Sexual Violence

Since its founding in 1878, the ABA has been a nonpartisan organization that serves as the national voice of the legal profession. *See About Us*, Am. Bar Ass'n, https://www.americanbar.org/about_the_aba (last visited Apr. 23, 2025). The ABA works to improve the administration of justice, promotes programs that assist lawyers and judges in their work, accredits law schools, provides continuing legal education, and works to build public understanding around the world of the importance of the rule of law. *See id.* The Association, through various components, offers many pro bono, public service, and education programs that improve access to justice in the United States and globally. *See id.*

One such component is ABA CDSV. The ABA created this component—originally called the Commission on Domestic Violence—in tandem with the development and passage of the landmark 1994 Violence Against Women Act. Amanda Robert, *Supporting Survivors: ABA and its members have shaped the Violence Against Women Act for 30 years*, ABA Journal (Nov. 26, 2024), https://perma.cc/PH6G-6MS9. ABA CDSV works to increase access to justice for survivors of domestic violence, sexual assault, and stalking by mobilizing the legal profession. Decl. of Maricarmen Garza (Garza Decl.) ¶ 6. To advance that mission, ABA CDSV provides training and technical assistance to legal practitioners and adjudicators who work with survivors, as well as collaborates with and supports partner organizations and advocates nationwide. *Id.* ABA CDSV has become the go-to resource for legal service providers working with clients who are survivors, and in many instances, it is the only organization available as a resource for information and assistance exclusively to lawyers in this field. *Id.*

Unsurprisingly, then, ABA CDSV has long had a productive relationship with DOJ's Office on Violence Against Women (OVW), which was created by the same Violence Against Women Act that spurred ABA CDSV's creation. By statute, OVW is charged with administering grant programs designed to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable. *See Grant Programs*, OVW, https://perma.cc/GA4V-ELEQ (last visited Apr. 23, 2025). For nearly 30 years, OVW has awarded grants to ABA CDSV to provide training and technical assistance, and OVW has routinely recognized the excellence of ABA CDSV's work. Garza Decl. ¶ 7. Working with clients who are survivors of domestic and sexual assault requires particular knowledge and skills that are generally not learned in law school—for example, how to work with traumatized individuals and how to cross-examine manipulative abusers. *Id.* ¶ 8. To fill this gap, ABA CDSV has developed best practices to successfully equip legal practitioners in this space with the necessary tools and the ability to do their difficult work effectively without burning themselves out. *Id.* ¶ 8.

ABA CDSV's track record is excellent. It has never been found to be in noncompliance with the conditions of any OVW grant award. *Id.* ¶ 32. On the contrary, for every grant that has been awarded to date, ABA CDSV has successfully been awarded a renewed grant by reapplying during a successive award cycle. *Id.* ¶ 16. In addition, because of its deep experience and consistently excellent execution, OVW has continually looked to ABA CDSV as a resource for advice, collaboration, and support. For example, ABA CDSV has regularly provided input on new OVW grant programs, as its work allows it to identify areas of need. *Id.* ¶ 32. ABA CDSV also partners with OVW to train award recipients at the start of each new grant cycle, by helping to plan OVW's trainings and develop the curricula and by hosting several of its own training sessions. *Id.*

**B. DOJ issues the Blanche Memo retaliating against the ABA for its speech and advocacy**

Despite the ABA's long and productive partnership with DOJ, on April 9, 2025, Deputy Attorney General Todd Blanche issued a memorandum to all DOJ employees significantly restricting their "engagement with" the ABA. Memorandum from Deputy Att'y Gen. Todd Blanche to All Dep't Emps. (Apr. 9, 2025), https://perma.cc/P6E7-B68K ("Blanche Memo"). The Blanche Memo decries the ABA's litigation activities, including its filing of a lawsuit (challenging the federal government's termination of the ABA's foreign-assistance grants) and the ABA's taking positions that DOJ views as "contrary to the federal government's policies" and "not aligned with the positions advanced by the Department of Justice." *Id.* at 1. It specifically calls out the ABA's support for what the memo deems "activist causes," including by filing amicus briefs "arguing against . . . regulation of abortion," "endorsing the consideration of race in admissions policies," and "supporting [an] effort to compel speech inconsistent with a citizen's religious beliefs." *Id.* at 1 n.2. And the memo suggests that engagement with the ABA—a national organization that has an established mission of defending liberty and delivering justice, and a long history of carrying out that promise, including alongside DOJ—is contrary to DOJ's "core mission of administering justice in a fair, effective, and even-handed manner." *Id.* at 2. The memo concludes that being "careful stewards of the public fisc" demands not using "taxpayer-funded resources" for the ABA. *Id.* at 1–2.

Based on those conclusions, the Blanche Memo sets out a new policy sharply limiting DOJ employees' engagement with the ABA. In addition to barring certain employees from maintaining ABA memberships even with their own personal funds and restricting them from participating in ABA activities even on personal time, the Blanche Memo states that DOJ "will no longer use taxpayer funds to pay for any travel to or engagement with ABA events"; prohibits all employees from "speak[ing] at, attend[ing], or otherwise participat[ing] in events hosted by the ABA" in their official capacities; and bans employees from "participat[ing] in ABA-sponsored events on official

time." *Id.* For those employees still permitted to engage with the ABA in their personal capacities

and on personal time, the memo withdraws—for ABA-related activities and ABA-related activities

only—the longstanding permission employees otherwise generally have to use DOJ resources (such

as computers, phones, internet access, and database access) for personal purposes where that use

involves only negligible expense. *Id.* at 2 & n.6.

### C. DOJ terminates all of ABA CDSV's grants

The following day, on April 10, 2025, DOJ's OVW abruptly terminated *all* of ABA CDSV's

grants—bringing to an immediate end five active grants that ABA CSV had been awarded after a

highly competitive process and that ABA CDSV was using to improve support for survivors of

domestic and sexual violence. Garza Decl. ¶¶ 17–28, 42, & Ex. A. OVW also purported to cancel

two grants that had already ended. *Id.* ¶ 41. The terminations came out of the blue. OVW had never

expressed any concern about ABA CDSV's performance on the grants or signaled a waning

commitment to ABA CDSV's work. *Id.* ¶ 33. On the contrary, in the days and even hours leading up

to the mass termination, it was business as usual. OVW grant managers had been in regular contact

with ABA CDSV staff about training materials, budgets, and other ordinary grant topics. *Id.* ¶¶ 35–

39.

The termination letter ended the ABA CDSV grants "effective immediately." Garza Decl.

Ex. A. According to the letter, the awards were "being terminated because a Department review of

them has concluded that they 'no longer effectuate[] the . . . agency priorities.' 2 C.F.R.

§ 200.340(a)(4)." *Id.* The letter provided no additional explanation, nor did it provide any

opportunity to challenge the termination decision. *Id.* Instead, it immediately cancelled the

unobligated amounts remaining on the awards and advised ABA CDSV that it could not use award

funds "for obligations incurred, or expenditures made, after receipt of this notice." *Id.*

The termination letter ended the five active grants ABA CDSV was using to carry out five important projects:

- The Civil Litigation Skills Project has, in some form, been funded by DOJ's OVW for more than 25 years and was most recently awarded $1,000,000 for October 1, 2022, through September 30, 2025. Garza Decl. ¶¶ 18–19. This project offers intensive training on both client interactions and advocacy to civil attorneys who represent gender-based violence survivors, and it connects those attorneys with on-demand individualized support, referrals, and consultation. *Id.* ¶ 18.

- The Trauma-Informed Representation Project received a $600,000 grant for October 1, 2022, through September 30, 2025. *Id.* ¶ 21. This project trains legal services providers to offer trauma-informed and client-centered representation—that is, representation that is grounded in survivor safety, choice, collaboration, and empowerment. This project also aims to counter not only the traumas that survivors face but also the secondary trauma that their attorneys face at high rates. *Id.* ¶ 20.

- The LGBTQI+ Legal Access Project received a $450,000 grant for October 1, 2024, through September 30, 2027. *Id.* ¶ 24. This project offers training, technical assistance, and individualized support to help counter obstacles that LGBTQI+ survivors can face in accessing legal services, law enforcement resources, and adequate protection in family courts. *Id.* ¶ 23.

- The LGBTQI+ Training for Coalitions project received a $400,000 grant for October 1, 2024, through September 30, 2027. *Id.* ¶ 26. This project trains coalitions to address the unique difficulties that LGBTQI+ victims face getting help. *Id.* ¶ 25.

- The Expanding Legal Services Initiative received a $750,000 grant for October 1, 2023, through September 20, 2026. *Id.* ¶ 28. This is part of a new OVW initiative to expand

legal services, and for which OVW awarded grants to eight community organizations. To support this effort, OVW chose ABA CDSV to provide training and technical assistance to these new grantees to enable them to stand up legal services programs within their own organizations. *Id.* ¶ 27.

### D. The grant terminations are causing irreparable harm

DOJ's termination of ABA CDSV's grants is already causing irreparable harm. As an initial matter, the grant cancellations, which are designed to chill the ABA's protected speech and petition rights, plainly harm the ABA's First Amendment rights. Moreover, because of the terminations, ABA CDSV has had to abruptly end its programming, leaving in the lurch legal services practitioners and the domestic and sexual violence survivors they serve. Garza Decl. ¶¶ 50–54. And, without its grant funds, ABA CDSV will be forced to begin laying off some of its staff within a few weeks, and it will have to wind down its operations within about a month. *Id.* ¶ 48. Without its funding and staff, ABA CDSV will not be able to function at all, bringing to a sudden end the important work it has done since the Violence Against Women Act's passage over a quarter-century ago. *Id.* ¶¶ 49–50. It will not be able to help legal practitioners who have come to rely on ABA CDSV's expertise. *Id.* ¶¶ 50, 53. It will not be able to provide trainings, including to nearly 650 people who have already signed up for them this year. *Id.* And it will not be able to pass on grant funds to partner organizations that provide services in the field, or to continue serving as a needed resource for those partners. *Id.* ¶ 51; Decl. of Stacy Malone (Malone Decl.) ¶¶ 10–12. With ABA CDSV's services cut, legal services providers will lack resources to gain critical skills and access support they need to represent their clients effectively. Garza Decl. ¶ 50; Malone Decl. ¶¶ 2, 13–14. The ultimate victims will be survivors of domestic and sexual violence who will not get the representation they need. Garza Decl. ¶ 50.

Based on the ABA's communications with its partners and other organizations that receive OVW funding, it understands that DOJ has terminated no other organization's grant awards. Garza Decl. ¶ 45. To the contrary, DOJ has taken steps to assure other OVW award recipients that it is committed to the continuation of their projects. *Id.* ¶¶ 45–46.

## II. Regulatory Background

Detailed regulations govern DOJ's grants, including those administered by OVW, and specify the grounds on which they may be terminated. These regulations stem from Office of Management and Budget (OMB) Uniform Guidance for Federal Financial Assistance, codified at 2 C.F.R. part 200, which OMB promulgated pursuant to its authority to "establish government wide financial management policies for executive agencies," 31 U.S.C. §§ 503(a), 504. The OMB Uniform Guidance generally requires federal agencies to "implement" OMB's guidance "in codified regulations." 2 C.F.R. § 200.106. DOJ has followed that instruction by issuing its own regulation adopting the OMB Uniform Guidance. 2 C.F.R. § 2800.101.

The Uniform Guidance adopted by DOJ includes a provision specifying the circumstances in which an agency can terminate a grant. There are three: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a).

Under this regulation, a change in agency priorities is a permissible basis for terminating a grant only if the terms and conditions of the award specify that as a ground for termination. Amendments to the Uniform Guidance that OMB adopted in April 2024 make this clear. Even before that most recent amendment, the Uniform Guidance already required grantor agencies to "clearly and unambiguously specify all termination provisions in the terms and conditions of the

Federal award." *Id.* § 200.340(b); *see also* 85 Fed. Reg. 49506, 49560 (Aug. 13, 2020). Yet, previously,

the guidance also stated that an agency could terminate an award if it "no longer effectuates the

program goals or agency priorities," without specifying that this ground for termination had to be

stated in the award's terms and conditions. *See* 85 Fed. Reg. at 49559. To increase transparency for

award recipients, OMB revised the guidance to make clear that an agency could terminate a grant for

failure to effectuate "program goals or agency priorities" only if the terms and conditions of the

award so provide. 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (stating that terminations based on

agency priorities were still permitted "[p]rovided that the language is included in the terms and

condition of the award"). As OMB explained, this ensures that agencies "clearly and unambiguously

communicate termination conditions in the terms and conditions of the award." *Id.* These

requirements apply to any federal award active on or after October 1, 2024, with respect to actions

after that date. *See id.* at 30046; *see also* U.S. Dep't of Justice, *DOJ Grants Financial Guide*,

https://perma.cc/TT35-JMSF (last updated Oct. 2024).

   None of the conditions of ABA CDSV's terminated grant awards specifies that the award

could be terminated based on the failure to effectuate agency priorities. Garza Decl. ¶ 31.

### LEGAL STANDARD

   To obtain a temporary restraining order or preliminary injunction, "the moving party must

show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury

if the [temporary restraining order] were not granted, (3) that [such an order] would not substantially

injure other interested parties, and (4) that the public interest would be furthered" by the order.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation

marks omitted); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard

applies to both temporary restraining orders and to preliminary injunctions." (internal quotation

marks omitted)). "When the movant seeks to enjoin the government, the final two TRO factors—

balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67

(D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit apply a "sliding scale" approach, wherein "a strong showing on one

factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40

F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks omitted) (noting potential tension in case

law but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R.*

*Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int.*

*Made as of Jan. 25, 2007*, No. 22-1043, 2024 WL 3443596, at *1–2 (D.D.C. July 15, 2024) (recognizing

that district courts remain bound by sliding-scale precedent).

## ARGUMENT

## I.  The ABA Is Likely to Succeed on the Merits

### A.  The grant terminations violate the First Amendment

#### 1.  The terminations are unconstitutional retaliation

The First Amendment guarantees every American the right to "freedom of speech" and "to

petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment

right to petition includes the right "to appeal to courts and other forums established by the

government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). "Official reprisal for protected

speech offends the Constitution [because] it threatens to inhibit exercise of the protected right."

*Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal quotation marks omitted). The government

therefore violates the First Amendment when it retaliates against someone for engaging in protected

speech or petitioning conduct. *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *Smith v.*

*Arkansas State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) (a person can "speak freely and

petition openly, and he is protected by the First Amendment from retaliation for doing so").

To establish a claim for retaliation under the First Amendment, a plaintiff must show "(1) that he engaged in protected conduct, (2) that the government took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action taken against him." *Doe v. District of Columbia*, 796 F.3d 96, 106–07 (D.C. Cir. 2015) (internal quotation marks omitted). To establish a causal link, "a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Id.* (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)); *see also Hartman*, 547 U.S. at 256 ("[W]hen nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

The termination of ABA CDSV's grants by DOJ's OVW easily satisfies these three factors.

***First***, the ABA has engaged in protected conduct, both by speaking and by petitioning the government. Most prominently, as DOJ called out in the Blanche Memo, the ABA is a plaintiff in a lawsuit filed against the federal government. *See* Compl., *Global Health Council v. Trump*, No. 1:25-cv-402 (D.D.C. filed Feb. 11, 2025) (seeking declaratory and injunctive relief, in part to compel the government to unfreeze congressionally appropriated funding for international development grants, including grants to the ABA). The right to petition "'extends to [petitioning] all departments of the Government,' including administrative agencies and courts." *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 738 (D.C. Cir. 2011) (quoting *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)); *see also In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979) (It is "indisputable that attorneys and parties retain their First Amendment rights even as participants in the judicial process."), *overruled on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). Conduct in litigation, including litigation against the government, is therefore plainly protected by the First Amendment.

The ABA has also engaged in protected speech. For example, as DOJ also called out, the ABA has, many times over the years, advanced positions in federal court litigation as an *amicus curiae*. The Blanche Memo explicitly references three such litigation positions it deems "contrary to the federal government's policies." *See* Blanche Memo at 1 n.2. Briefs filed in court, whether as a party or an *amicus curiae*, fall under both the right to petition (when the brief seeks relief from government action) and the right to free speech.

**Second**, the grant terminations would "deter a person of ordinary firmness in [the ABA's] position from speaking again," *Doe*, 796 F.3d at 106, and are therefore "sufficiently adverse . . . to give rise to an actionable First Amendment claim," *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). The termination of ABA CDSV's grants significantly harms the ABA by depriving it of funds that it was awarded through competitive grants. This retaliatory action will force the ABA to shutter CDSV in less than a month, as explained below, *infra* section II. The sudden ripping away of funding—thereby functionally extinguishing an entire, longstanding branch of the ABA's work—is unquestionably "sufficiently adverse . . . to give rise to an actionable First Amendment claim." *Wilson*, 595 U.S. at 477.

**Third**, the ABA's protected speech and petitioning activities are undoubtedly the but-for cause of DOJ's retaliatory actions. DOJ stated in plain terms that it is taking action against the ABA in response to the ABA's protected First Amendment activities. The Blanche Memo acknowledges that DOJ was acting to change its relationship with the ABA because "the ABA filed a lawsuit against the United States." *Id.* (citing Compl., *Global Health Council v. Trump*, No. 1:25-cv-402 (D.D.C. filed Feb. 11, 2025)). It goes on to state that, "[a]s a result" of the ABA's lawsuit, DOJ "is actively litigating against the ABA, yet . . . continues to expend taxpayer dollars on ABA events" and to allow DOJ personnel to otherwise engage with the ABA. *Id.* The memo also calls out three specific

13

examples of positions that ABA previously advanced as an *amicus curiae* in litigation before the U.S. Supreme Court that DOJ deems contrary to current "Presidential policy choices." *Id.* at 1 & n.2.

The Blanche Memo then explicitly ties its disagreement with the ABA's speech and litigation positions to government funding. DOJ, it states, must "be careful stewards of the public fisc." *Id.* at 1. It contends that the use of "taxpayer-funded resources[ ]must be focused on achieving the Department's core Constitutional mission and advancing the . . . decisions made by the political branches of our government." *Id.* at 2. The very next day, DOJ identified another way to cut off government money that flowed to the ABA: it terminated ABA CDSV's OVW grants without warning.

The suddenness and breadth of the termination letter, the disparity in DOJ's treatment of the ABA compared to other grantees, the proximity in time between the termination letter and the Blanche Memo, and its halting of "taxpayer-funded resources" to the ABA make clear that the ABA's speech and advocacy were the motivating factor in the grant terminations. It is thus because of the ABA's litigation against the federal government and advocacy contrary to the current Administration's preferred policies that DOJ has cut funding to the ABA. The Blanche Memo makes explicit what retaliators usually attempt to obscure: DOJ's adverse actions, including those relating to the "public fisc," were imposed in response to the ABA's protected First Amendment activities.

Moreover, the explanation provided by the termination letter—an unspecified change in "agency priorities," Garza Decl. Ex. A—makes little sense in context. As of this filing, the ABA is unaware of any other OVW grantee whose grant awards have been terminated. Garza Decl. ¶ 45. That includes many other OVW grantees who also offer training and technical assistance for legal professionals who work with domestic and sexual assault survivors. *Id.* Further, with respect to at least one of ABA CDSV's grant projects, OVW has informed other grantees in the same program

that, notwithstanding the termination of *the ABA's* grants, OVW remains committed to the success of the other grantees' projects, and OVW is "develop[ing]" a "new . . . plan" to fill the ABA's role. *Id.* ¶ 46. These statements directly contradict OVW's unexplained suggestion that the grant it awarded to ABA CDSV to support the success of those other grantees' projects "no longer effectuate[s] . . . the agency priorities." *Id.* DOJ's inclusion of two already-ended grant awards in the termination notice further undermines DOJ's assertion that it conducted a "review" of ABA CDSV's grant awards to determine that they no longer effectuate agency priorities. *Id.* ¶ 41 & Ex. A.

DOJ's actions leave little room for doubt as to the but-for cause of the termination of ABA CDSV's grants, and thus the retaliatory nature of those terminations.

### 2.    The terminations are unconstitutional viewpoint discrimination

It is axiomatic that the government may not regulate speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *see also Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) ("To permit one side . . . to have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees." (internal quotation marks omitted)). Such government targeting is a "'blatant' and 'egregious form of content discrimination.'" *Reed*, 576 U.S. at 158 (quoting *Rosenberger,* 515 U.S. at 820). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

Particularly in light of the Blanche Memo, DOJ's termination of ABA CDSV's grants is transparent discrimination against the ABA for its "opinion or perspective," *Reed*, 576 U.S. at 168—in particular, the ABA's litigation against the federal government and its positions in previous litigation. This discrimination is designed to silence criticism of the government by the ABA and others, and to chill them from supporting policies and perspectives adverse to this Administration.

Because DOJ's actions are facially viewpoint discrimination, they are subject to strict scrutiny and therefore unconstitutional unless the government demonstrates that its actions "further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Id.*, 576 U.S. at 171. There is no legitimate governmental interest, much less a "compelling" one, in singling out ABA CDSV's grants for cancellation, to the potential detriment of other OVW grantees and, ultimately, to the legal services providers who work with domestic and sexual violence survivors. There is no compelling interest in punishing an organization for, or chilling it from, advancing views with which the government disagrees. On the contrary, there is a compelling interest in *permitting* organizations to present to courts views contrary to the government's. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545–48 (2001). And the government cannot claim a compelling interest in withholding from an entity government resources based on that entity's viewpoint. The termination of those grants therefore constitutes viewpoint discrimination in violation of the First Amendment.

## B.  The grant terminations violate the APA

The APA permits judicial review of "final agency action," 5 U.S.C. § 704, and provides that a court "shall" "hold unlawful and set aside agency action" that is, among other things, "contrary to constitutional right," "not in accordance with law," or "arbitrary [and] capricious," *id.* § 706(2)(A)–(C). The grant terminations should be set aside under the APA because they are final agency action that is contrary to constitutional right, contrary to law, and arbitrary and capricious.

### 1.  The terminations are final agency action

The Administrative Procedure Act makes reviewable "final agency action." *Id.* § 704. DOJ's termination of all of ABA CDSV's grant funding is a final agency action subject to review under the APA. Final agency actions "mark the consummation of the agency's decisionmaking process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). Here, the

terminations "mark the consummation" of DOJ's decision-making process because they announce

DOJ's final decision on the matter, and the actions have the legal consequence of the immediate loss

of funding to ABA CDSV. *See, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239, —

F. Supp. 3d —, 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (holding that pause on funding

constituted final agency action).

### 2.    The terminations are contrary to constitutional right

The ABA is likely to succeed on its claim that the termination of ABA CDSV's grants is

contrary to constitutional right because, as explained above, it violates the ABA's First Amendment

protections. *See supra* section I.A.

### 3.    The terminations are contrary to law

The ABA is also likely to succeed on its claim that the termination of ABA CDSV's grants

are "not in accordance with law," 5 U.S.C. § 706(2)(A). An agency is "bound by its own regulations,"

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal

quotation marks omitted), so failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F.

Supp. 2d 179, 191 (D.D.C. 2008).  The relevant regulation, 2 C.F.R. § 200.340(a), as adopted by DOJ

at 2 C.F.R. § 2800.101, authorizes an agency to terminate a federal award only in certain specific

instances: if the grantee "fails to comply with the terms and conditions" of the award, if the grantee

consents, or "pursuant to the terms and conditions of the award, including, to the extent authorized

by law, if [the] award no longer effectuates . . . agency priorities." *Id.* § 200.340. None of those

circumstances applies here. ABA CDSV did not fail to comply with award terms and conditions, and

it did not consent to the termination. Nor did DOJ identify any way in which the termination was

"pursuant to the terms and conditions" of the awards. The termination letter stated that ABA

CDSV's grants were being terminated because DOJ had concluded that the grants "no longer

effectuate[] . . . agency priorities," but the regulation permits terminating an award on that basis only

17

if specifically permitted by the terms and conditions of the award. *See supra* Background section II.

The grants here do not permit termination on the basis of "agency priorities," Garza Decl. ¶ 31, and

the grants' termination therefore violates the applicable regulation.

In sum, DOJ can point to no regulatory provision that would permit the termination here.

The ABA is therefore likely to succeed on its claim that the terminations of ABA CDSV's grants

should be set aside under 5 U.S.C. § 706(2)(A).

### 4.    The terminations are arbitrary and capricious

The ABA is also likely to succeed on its claim that the termination of ABA CDSV's grants

was "arbitrary [and] capricious." *Id.* § 706(2)(A). Under arbitrary and capricious review, courts must

hold unlawful any agency action that is "not 'reasonable and reasonably explained.'" *Ohio v. EPA*,

603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Defendants' termination of ABA CDSV's grants fails twice over—it is neither substantively

reasonable nor reasonably explained.

As to substantive reasonableness, an agency action is not substantively "reasonable" if,

"given the facts, the agency exercised its discretion unreasonably." *Multicultural Media, Telecom &*

*Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017). The reason articulated for the grant

terminations in the termination letter itself—an unspecified change in agency priorities—is clearly

pretextual. Indeed, in light of the apparent continuation of all other OVW grants, and DOJ's

"commit[ment] to the success" of other grantees' related projects, Garza Decl. ¶ 46, the letter's

explanation is highly implausible. Instead, the true reason is apparent in the Blanche Memo: to cut

off "taxpayer funds" to the ABA. Blanche Memo at 1. That decision is facially unreasonable. And

the arbitrary nature of DOJ's decision is further revealed by its inexplicable termination of two

grants (of seven total) that had already ended. *See* Garza Decl. ¶ 41. DOJ's decision to terminate the

grants thus relies on animus—necessarily an unreasonable basis for any agency action. *See Robbins v.*

*Reagan*, 780 F.2d 37, 50 n.20 (D.C. Cir. 1985) ("An agency decision prompted by personal animus would run afoul of the requirement that agencies act in a reasoned, nonarbitrary manner.").

Even taking at face value DOJ's claim that it was terminating the grants for failure to "effectuate agency priorities," the terminations must be set aside because they are not reasonably explained. An agency action is not reasonably explained where the agency has failed to provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Thus, an agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* DOJ's explanation for the terminations doubly fails this test.

For one, DOJ's one-line reason for the terminations—that the agency had concluded that the grants "no longer effectuate[] the . . . agency priorities," Garza Decl. Ex. A (alterations in original)—hardly qualifies as a "satisfactory explanation," *State Farm*, 463 U.S. at 43. DOJ did not identify the relevant agency priorities, explain why ABA CDSV's work no longer effectuated them, or offer any explanation at all for what had changed. DOJ's boilerplate regurgitation of the language in 2 C.F.R. § 200.340, with no elaboration, does not satisfy the APA's requirement for "reasoned decisionmaking." *Id.* Indeed, this Court recently found just this type of "conclusory" reference to "agency priorities," "unsupported by any facts or reasoning," to be arbitrary and capricious. *RFE/RL, Inc. v. Lake*, — F. Supp. 3d —, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025) (concluding that "one line" explanation in grant termination letter "stating that 'the award no longer effectuates agency priorities'" was "not a 'satisfactory explanation' and offers no 'rational connection between the facts found and the choices made'").

In addition, DOJ "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, in failing to consider ABA CDSV's reliance interests and the impact that withdrawing its funding would have on ABA CDSV's partners, the legal services providers it works with, and the survivors of domestic and sexual violence who ultimately benefit from ABA CDSV's work. *See generally, e.g.*, Malone Decl. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks omitted); *see also Nat'l Council of Nonprofits*, 2025 WL 597959, at *15 (concluding that freezing of funds was arbitrary and capricious because government "ignored significant reliance interests," potentially requiring organizations to face "immediate firings or the discontinuation of entire programs"); *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions."). DOJ never considered the obvious and substantial reliance interests of ABA CDSV, which has relied on OVW grant funding since its inception and is immediately faced with laying off staff and discontinuing all of its work. *See supra* Background section D. Nor did DOJ consider "[t]he consequences of [its action]," which "would radiate outward" to ABA CDSV's clients, partners, and the legal community, which benefit from ABA CDSV's programs and resources. *Regents of the Univ. of Cal.*, 591 U.S. at 31 (internal quotation marks omitted). Those failures are arbitrary and capricious. *See, e.g.*, *id.* at 33.

That DOJ and the ABA had a constructive working relationship for decades before the termination decision further underscores the capriciousness of DOJ's decision to switch gears with no reasoned explanation. As one district court recently observed, the government's "failure to provide a reasoned explanation is 'even more egregious in light of the drastic change' from the existing policies under which the grant awards had been authorized.'" *California v. Dep't of Educ.*, No. 25-10548, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (quoting *Massachusetts v. NIH*, 2025 WL

20

702163, at *18 (D. Mass. Mar. 5, 2025)). DOJ thus failed to engage in reasoned decision-making, and the ABA is likely to succeed on its APA claims.

## II.  The ABA Will Suffer Immediate and Irreparable Harm Absent Immediate Relief

The ABA is suffering and will continue to suffer irreparable harm from DOJ's retaliatory and otherwise unlawful termination of ABA CDSV's grants. In light of the ABA's likelihood of success on the merits, its First Amendment injuries require emergency relief. *See Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022). And the threat to ABA CDSV's very existence requires as much speed as possible in obtaining that relief.

It is settled law in this Circuit that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* (internal quotation marks omitted); *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same, as to "the loss of constitutional freedoms" generally (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." (internal quotation marks omitted)). Thus, "[s]uits involving 'the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.'" *Talbott v. United States*, No. 25-cv-240, 2025 WL 842332, at *36 (D.D.C. Mar. 18, 2025) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)).

As described above, the ABA's "First Amendment interests are . . . being impaired" by DOJ's adverse actions, which are designed to chill the ABA's protected speech and petition rights. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Nat'l Treasury Employees Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991)). The ABA has thus established that it is being irreparably injured by DOJ's adverse actions against it.

Further, accounting for its current funds and expenses, ABA CDSV will have no choice but to begin laying off some of its staff within the next few weeks at most. Garza Decl. ¶ 48. It will have to lay off most or all of its seven-person staff within a month. *Id.* "Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025). Without its grant funding, and without its staff, ABA CDSV will not be able to carry out its work at all. *See, e.g.*, *id.* ("The very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their grant money."); *Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992) (finding irreparable injury where the monetary loss would cause significant capital costs and employee lay-offs); *McGregor Printing Corp. v. Kemp,* No. 91-3255, 1992 WL 118794, at *5 (D.D.C. May 14, 1992) (finding that "the irretrievable monetary loss to [plaintiff] in combination with the loss in employment to [plaintiff's] employees" amounted to irreparable harm); *cf. Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (monetary loss that "threatens the very existence of the movant's business" constitutes irreparable harm).

Absent quick relief, the grant funding itself may be unrecoverable. "[I]n cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'" *Climate United Fund*, 2025 WL 1131412, at *17 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994)). While this case remains pending, OVW may very well choose to award the funds and responsibilities under ABA CDSV's grants to new recipients. *Cf. id.* ("Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses."); *see also, e.g.*, *Ambach v. Bell*, 686 F.2d 974, 986 (D.C. Cir. 1982) ("Once the chapter 1 funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary

injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (noting that "if the government in the instant case is permitted to *distribute* the $10 million to other organizations, the appeal will become moot"). This risk is made more likely here by OVW's written assurances, in light of the termination of ABA CDSV's grants, that it remains "committed to the success" of certain other grantees' projects, which have relied on ABA CDSV for crucial training and technical assistance and continue to need that support. Garza Decl. ¶ 45.

### III. The Equitable Factors Strongly Favor Emergency Relief

The final two temporary restraining order factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the ABA's strong likelihood of success on the merits, *see supra* section I, itself establishes that the equities and public interest favor preliminary relief. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). There is therefore "generally no public interest in the perpetuation of unlawful agency action." *Id.*

That is all the more true where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (cleaned up); *see also, e.g.*, *Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)).

Even beyond the need to protect the ABA's First Amendment rights, granting preliminary relief to reinstate the ABA's grants is in the public interest. DOJ's actions ultimately harm survivors of domestic and sexual violence—people whom Congress has directed the federal government to support. 42 U.S.C. §§ 13925–14045d. Without its grant funding, ABA CDSV cannot assist legal practitioners or provide trainings, including to the nearly 650 people who have already registered for trainings scheduled this year. Garza Decl. ¶ 50. Nor can it pass on grant funds to partner organizations that work with ABA CDSV in executing the grants' programs. *Id.* ¶ 51; Malone Decl. ¶ 12. Those partner organizations, too, will not be able to run trainings without ABA CDSV, and they will no longer be able to refer legal services providers to ABA CDSV for assistance. Garza Decl. ¶ 50; Malone Decl. ¶ 14. ABA CDSV is among the most experienced and respected organizations doing this sort of work nationwide—and the gap it leaves will be hard to fill. Garza Decl. ¶ 53. Without ABA CDSV's programming, legal services providers will have nowhere else to turn to gain critical skills and access ad hoc support they need to represent their clients effectively. *Id.* ¶ 50. Survivors will not get the representation they need. *Id.* And without effective representation, survivors' lives will be damaged and lost. *Id.*[1]

## CONCLUSION

For all these reasons, the Court should grant the ABA's motion and enter a temporary restraining order, or preliminary injunction, as set forth in the attached proposed order.

---

[1] The ABA respectfully submits that, if the Court grants preliminary relief, it should also either waive any bond requirement under Federal Rule of Civil Procedure 65(c) or set the amount at $0. A bond is not warranted "where requiring one would have the effect of denying [a] plaintiff[] [its] right to judicial review of administrative action." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19. Imposing anything more than a minimal bond would have that effect here because, as explained above, ABA CDSV does not have the resources to function without the grant money that Defendants unlawfully withdrew—and so does not have the resources for a bond either. *Cf. Climate United Fund*, 2025 WL 1131412, at *21 ("Plaintiffs' funding is currently frozen because of Defendants' actions. They cannot access the very thing that has kept them running. Requiring a bond in this context makes little sense.").

April 24, 2025                                  Respectfully submitted,

                                                */s/ Brian Netter*
                                                Brian Netter (D.C. Bar No. 979362)
                                                Christine L. Coogle (D.C. Bar No. 1738913)*
                                                Pooja A. Boisture (NY Bar No. 5104559)**^
                                                Kristin Bateman (CA Bar No. 270913)*^^
                                                Josephine T. Morse (D.C. Bar No. 1531317)
                                                Skye L. Perryman (D.C. Bar No. 984573)

                                                DEMOCRACY FORWARD FOUNDATION
                                                P.O. Box 34553
                                                Washington, D.C. 20043
                                                (202) 448-9090
                                                bnetter@democracyforward.org
                                                ccoogle@democracyforward.org
                                                pboisture@democracyforward.org
                                                kbateman@democracyforward.org
                                                jmorse@democracyforward.org
                                                sperryman@democracyforward.org

                                                *Counsel for Plaintiff*

* *Full Admission Pending*
** *Pro Hac Vice forthcoming*
^ *Admitted only in New York; practice supervised by members of the D.C. bar*
^^ *Admitted only in California; practice supervised by members of the D.C. bar*