IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN BAR ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-01263 |

**DECLARATION OF MARICARMEN GARZA**

I, Maricarmen Garza, declare as follows:

1.     I am Chief Counsel of the American Bar Association (ABA) Commission on Domestic & Sexual Violence (CDSV). I have led the Commission since October 2024. I previously worked for more than 20 years as a legal services attorney, working in domestic violence movements and representing survivors. In my current role, I am responsible for policy, program, and financial management, including the management of ABA CDSV's grant funds, with the support of the ABA finance team. I also serve as an expert resource on gender-based violence and the law for ABA leadership and staff, attorneys, judges, legislators, the media, and others; manage program activities and budgets; serve as liaison and staff to ABA CDSV's members; and coordinate national policy initiatives.

2.     Prior to leading ABA CDSV, I served as Chief of Programs and Director of Strategic Partnerships and Community Engagement for the Tahirih Justice Center, a national organization that provides direct legal services, policy advocacy, and training and education to protect immigrant women and girls fleeing gender-based violence. Prior to joining Tahirih in 2021, I worked for 21 years as an attorney with Texas RioGrande Legal Aid (TRLA). In that role, I represented survivors of gender-based violence on complex family law and victim privacy matters. I also initiated and managed the Legal Alliance for Survivors of Abuse, a unique collaboration between TRLA and domestic violence shelters and rape crisis centers in 68 Texas counties, to ensure that victims received holistic, trauma-informed, and victim centered legal and social services critical to breaking the cycle of violence. I also managed TRLA's Victim Rights Group, which provided direction, mentorship, and supervision to the Legal Aid for Survivors of Sexual Assault team and the Survivor Centered Economic Advocacy team. Before working with TRLA, I began my career as a staff attorney for Catholic Charities in Houston, Texas, representing clients in removal proceedings, political asylum cases, and self-petitions under the Violence Against Women Act (VAWA).

3. I have also previously served as Chair of ABA CDSV and currently serve as a member of the board of the Texas Council on Family Violence, the statewide coalition for domestic violence. Over the last two decades, I have frequently served as an expert at national and international trainings on issues impacting victims of gender-based violence, provided expert witness testimony, and served on a state legislative taskforce to share my expertise in providing civil legal services to victims.

4. I have personal knowledge of the facts and information in this declaration. I respectfully provide this declaration to detail the ways in which ABA CDSV's mission and programs will be immediately and irreparably harmed by the abrupt termination of ABA CDSV's grants from the U.S. Department of Justice's (DOJ) Office on Violence against Women (OVW) under VAWA and subsequent legislation. These terminations immediately and severely threaten our ability to keep ABA CDSV's staff on payroll; to maintain relationships with critical partners in our work, many of whom also rely on pass-through funding from the terminated grants; and to continue our longstanding programs, including nationwide training and technical assistance programs. The terminations will also affect legal services providers and their clients nationwide, by cutting off an essential provider of training and technical assistance to legal professionals focused on survivors of domestic and sexual violence.

**ABA CDSV's Mission and Operations**

5. The ABA is the nation's largest voluntary association of lawyers, with a mission of defending liberty and pursuing justice. The ABA Fund for Justice and Education (FJE) is the 501(c)(3) charitable fund that supports the public service and education work of the ABA. The FJE offers many pro bono, public service, and education programs with a goal of improving access to justice in the United States and globally. ABA CDSV is an ABA FJE entity, and its focus is on

improving the legal representation of and advocacy for survivors of domestic violence, sexual assault, and stalking.

6. Since 1994, ABA CDSV has worked to increase access to justice for survivors of domestic violence, sexual assault, and stalking by mobilizing the legal profession. It accomplishes this by providing training and technical assistance to legal practitioners and adjudicators who work with such clients, as well as by collaborating with and supporting the efforts of partner organizations and advocates nationwide. ABA CDSV has become a go-to resource for legal service providers working with clients who are survivors and is, on certain topics, the best resource for information and assistance to lawyers in this field.

7. ABA CDSV is widely recognized as a leader in training and technical assistance for legal professionals working with survivors. Its reputation has been developed through its decades of consistent, effective work. OVW has awarded ABA CDSV training and technical assistance grants for nearly 30 years and has routinely recognized the excellence of ABA CDSV's work. In an email last year, one OVW grant manager praised a training guide that ABA CDSV developed as "a tremendous resource—comprehensive, accessible, and well-written." And OVW's respect and appreciation for ABA CDSV's work showed in our constructive and collaborative relationship with OVW throughout the years.

8. ABA CDSV particularly excels at bringing the human element into lawyering for survivors. Law school does not impart all of the particular knowledge and skills needed to represent and advocate for domestic and sexual violence survivors. For example, lawyers often have not learned how to effectively work with and represent traumatized individuals who are made to face their abusers in court. It takes practice and specialized skills to successfully cross-examine manipulative abusers. And lawyers may not recognize the ways in which an individual survivor's circumstances should shape their legal representation, sometimes taking priority over what a lawyer

3

would normally seek under the law. ABA CDSV has spent decades developing best practices to successfully equip legal practitioners in this space with the necessary tools, as well as preparing them to do their difficult work effectively without burning themselves out. Our hands-on trainings also allow lawyers to put their new knowledge and skills into practice and provide a space for them to make mistakes, and receive constructive feedback, in a situation where lives and livelihoods are not on the line. That opportunity and the experience gained is invaluable and has a significant, concrete effect on the domestic violence and sexual assault survivors who are helped by the attorneys we train nationwide.

9. Further, in addition to its trainings and technical services, ABA CDSV has—with support from OVW funding—previously published key standards of practice for attorneys representing survivors of domestic violence. These include *Standards of Practice for Lawyers Representing Victims of Domestic Violence Sexual Assault, and Stalking in Civil Protection Orders*; *Supervision Standard*; *Model Legal Services Agreements*; *Comprehensive Issue Spotting*; *Guide to Case Selection Criteria*; and *The Impact of Domestic Violence on Your Legal Practice*. ABA CDSV has also published many other resources that continue to be invaluable to OVW grantees and lawyers across the country who work with survivors. Lawyers in this field regularly rely on ABA CDSV's standards and publications in their practice, and they continue to request and download these resources.

10. Attendees of ABA CDSV trainings and recipients of technical assistance routinely refer to ABA CDSV's services and resources as "invaluable." Feedback received from trainings and other services have included that attorneys "learned a great deal" and "loved the interactive, intensive training as opposed to being 'talked at.'" One attorney noted that, after practicing law for 30 years in South Carolina, including significant work under a VAWA grant, they still "found [ABA CDSV's] training excellent and beneficial." A domestic violence attorney in Virginia lauded the "benefit of the Custody Litigation Institute" as providing an opportunity to receive "a helpful

critique of their litigation skills from a judge, opposing counsel or another peer." The institute gave that attorney "valuable strategies for presenting [a] case, creating a closing, and understanding how to create value for [a] client's needs." They wrote, "I have been a domestic violence attorney for five years and this was the single most helpful training I have had." Another attorney who attended a webinar and used ABA CDSV's services found the "Commission staff . . . so helpful, both during the webinar and after." They pledge to "continue to use [ABA CDSV] resources" and share them with other attorneys, "in order to more effectively represent clients in domestic violence cases."

11. ABA CDSV fulfills this work with only seven full-time staff members, including me. Five of our staff are entirely or mostly funded by OVW grant money. In addition to managing the grant applications, funds, and conditions, ABA CDSV staff create curricula, develop training plans, establish relationships with partners, facilitate the trainings, and field frequent requests for technical assistance. Although ABA CDSV still occasionally hold trainings in person, following the COVID-19 pandemic, the majority of its trainings and assistance are now provided virtually.

**Office on Violence Against Women Grants**

12. OVW implements the provisions of VAWA, including the administration of grant programs authorized by that statute and subsequent legislation. As OVW's website describes, "[t]hese grant programs are designed to develop the nation's capacity to reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable." *Grant Programs*, OVW, https://www.justice.gov/ovw/grant-programs. These grant programs include discretionary programs, for which OVW determines the parameters, requirements, qualifications, and deliverables for grantees.

13. OVW grants generally provide funding for performance periods lasting two to three years. The grants are awarded following an open application process and are extremely competitive. To commence the application process, OVW posts to its website a notice of funding opportunity,

5

which describes the grant and application requirements. Prospective grantees must prepare and submit a comprehensive application packet, including, among other materials, a 20-page proposal narrative, budget proposal, letters of support from community partners and others familiar with the prospective grantee's work, and memorandums of understanding with project partners who will aid the grantees in specified ways to carry out the project.

14. When a grant is awarded, OVW provides the grantee an award letter along with relevant information, including the conditions of the award and the assignment of a grant manager. Each grant award is a cooperative agreement between the award recipient and OVW and includes an understanding that "OVW will play a substantial role in shaping and monitoring the project." The grant manager is an OVW employee who serves as the point of contact on the relevant grant.

15. One condition of OVW grants is that grantees must submit to OVW all materials and publications, in any format, that are funded by the grants. They must do so at least 20 days before publication or dissemination to allow OVW to review and approve the submissions. If OVW requires changes to any submissions, those changes are communicated through the grant manager and must be implemented before publication.

16. For each of the grants that it has previously been awarded, ABA CDSV has successfully been awarded a renewed grant upon reapplying during successive award cycles.

**ABA CDSV's Projects Funded by OVW Grants**

17. Before the terminations, ABA CDSV had five active OVW grants, which made up almost the entirety of ABA CDSV's current funding.

18. Although it has evolved and changed names over the years, the Civil Litigation Skills Project is ABA CDSV's longest-running project, in existence and funded by OVW grants for about 25 years. The project offers intensive, victim-centered, skills-building training to civil attorneys who represent gender-based violence survivors. It provides these attorneys with emerging information,

6

specialized skills, tools, and resources to help them improve in their practice, both in their interactions with their clients and in their representation of and advocacy for them. It also connects these attorneys with on-demand individualized assistance, referrals, and consultation. Through this project, in addition to ad hoc support, ABA CDSV provides at least four trainings each year focused on custody litigation and trial skills, at beginner, intermediate, and advanced level.

19. Most recently, on September 28, 2022, DOJ awarded ABA CDSV $1,000,000 for the Civil Litigation Skills Project. The performance period for this grant is October 1, 2022, through September 30, 2025.

20. Another ABA CDSV program is the Trauma-Informed Representation Project, which works to ensure that legal services providers are equipped to offer trauma-informed and client-centered representation. This project has been funded by OVW grants since 2022, although trauma-informed legal representation has long been a cornerstone of all of our work. Trauma-informed representation is grounded in a commitment to survivor safety, choice, collaboration, and empowerment, and is foundational for effective and ethical legal services. At the same time, gender-based violence attorneys experience secondary or vicarious trauma at significantly high rates. This project addresses an urgent need to recognize and counter the traumas both survivors and providers endure. To that end, ABA CDSV offers both training and support to attorneys on trauma-informed and culturally responsive services for survivors, and training and support to organization leaders to institutionalize trauma-informed lawyering and vicarious trauma response. These trainings are crucial to give these attorneys the knowledge and skills they need to able to gain the trust of their clients, while safeguarding their own ability to continue in this difficult and emotionally taxing work.

21. DOJ awarded ABA CDSV a grant for the Trauma-Informed Representation Project on September 28, 2022, totaling $600,000 for a performance period of October 1, 2022, through September 30, 2025.

22. The Victim Rights Law Center (VRLC) is a subrecipient for the trauma-informed representation grant and a central partner to ABA CDSV in this work. VRLC is a nonprofit law center dedicated to serving the legal needs of rape and sexual assault survivors, by providing free, comprehensive civil legal services for survivors in Massachusetts and Oregon. VRLC and the ABA have a long history of collaboration as two long-term peer OVW training and technical assistance providers, having worked together in focus groups, advisory roles, and other projects with joint partners over more than 15 years. VRLC and ABA CDSV rely on this collaborative relationship and mutual cross-referrals to important resources in accomplishing the goals of Trauma-Informed Representation Project.

23. Since 2015, ABA CDSV has also run the LGBTQI+ Legal Access Project, which provides individualized support, training, and technical assistance to address domestic and sexual violence in LGBTQI+ communities specifically. Members of the LGBTQI+ community face systemic discrimination. Law enforcement may not have resources for an LGBTQI+ victim who calls for assistance, and prosecutors may be challenged in how to prove a criminal case against an LGBTQI+ perpetrator in a same-sex relationship before a jury. Many family courts do not have established protocols for all survivors looking to file for a civil protective order, and judges may not have the tools to handle such cases. Legal service providers often lack intake infrastructures that are accessible for LGBTQI+ victims. This project is designed to tackle these and related obstacles, which prevent LGBTQI+ victims from seeking and obtaining protection under the law. It accomplishes this through LGBTQI+ trainings provided primarily to legal services organizations, prosecutors, and judges.

24. Most recently, on September 26, 2024, DOJ awarded ABA CDSV $450,000 for the LGBTQI+ Legal Access Project. The performance period for this grant runs from October 1, 2024, through September 30, 2027. Because extra funds were available under our prior grant through a no-

8

cost extension (NCE), the prior grant continued through March 31, 2025. The funds provided by the current grant became available on April 7, 2025.

25. To train coalitions to address the difficulties faced by LGBTQI+ victims as described above, ABA CDSV also developed the LGBTQI+ Training for Coalitions Project, which began in 2022. The grant underlying this project provides for training and technical assistance to state and territorial coalitions on the needs of LGBTQI+ survivors. We partner with six different organizations under this grant. Our primary partner is the National LGBTQ Institute on Intimate Partner Violence, a project of the Los Angeles LGBT Center in partnership with the National Coalition of Anti-Violence Project and In Our Own Voices. Project partners provide training and technical assistance to state and territorial domestic violence, sexual assault, and dual coalitions on how coalitions can build LGBTQI+ inclusivity throughout their own work and the work of coalition member organizations.

26. ABA CDSV received the most recent grant award for the LGBTQI+ Training for Coalitions Project from DOJ on September 26, 2024, totaling $400,000. The performance period runs from October 1, 2024, through September 30, 2027.

27. Our newest grant, awarded for the first time in 2023, is for OVW's Expanding Legal Services Initiative (ELSI). In creating this brand-new initiative, OVW awarded ELSI grants to eight nonprofit community organizations that offer survivor services. These new grantees had not previously offered legal services and required significant training and technical assistance to be able to stand up their own legal services program. Thus, the purpose of this new grant to ABA CDSV was to help these grantees create their own legal programs, in the face of insufficient existing legal aid sources. ABA CDSV applied for and was awarded the training and technical assistance grant to provide this critical knowledge and support to the eight grantees. We designed an entirely new program for ELSI, to help mostly nonlawyers stand up legal programs within their organizations

providing support to survivors of domestic and sexual violence. Without ABA CDSV's role in ELSI, the community organizations would no longer have the ability to support that work. In FY24, eight additional community service organizations were awarded ELSI funds, and ABA CDSV had started working with them on their planning.

28. DOJ awarded ABA CDSV the ELSI grant on September 28, 2023, in the amount of $750,000. The project performance period runs from October 1, 2023, through September 20, 2026.

29. For each of these grants, ABA CDSV has prepared and submitted the comprehensive application materials described above, and it has done the same for every grant renewal opportunity. OVW grant awards are highly competitive: although ABA CDSV has consistently earned renewal of existing grants, we have not always won our bids for new grant awards.

30. Each grant award includes detailed information, including the award conditions, which are consistent across ABA CDSV's grants. Those conditions include, inter alia, that a failure to comply with award requirements may result in OVW "taking appropriate action," including that it may "withhold award funds, disallow costs, or suspend or terminate the award." The conditions provide that the requirements of 2 C.F.R. part 200, as adopted by DOJ, apply to the grant awards. They further provide that OVW may terminate or suspend the award if ABA CDSV fails to comply with applicable laws, regulations, and conditions; fails to "make satisfactory progress toward the goals, objectives, or strategies" of the award; or proposes or implements project changes that, "if originally submitted, the application would not have been selected." Such termination or suspension is governed by 2 C.F.R. § 200.340 and will last until OVW "is satisfied that there is no longer such failure or changes."

31. None of the conditions of ABA CDSV's terminated grants states that the award could be terminated based on the failure to effectuate agency priorities.

10

32. ABA CDSV has never been found to be in noncompliance with the conditions of any grant award and has never previously had a grant suspended or terminated. To the contrary, because of ABA CDSV's deep experience and consistently excellent execution, DOJ continually looks to us as a resource for grantees, for collaboration and support. In addition, we act as a partner to DOJ for trainings it holds for award recipients at the start of each new grant cycle. ABA CDSV coordinates and helps plan those trainings, helps develop the curricula for new grantees, and hosts several of its own training sessions.

**DOJ Terminations of All ABA CDSV Grants**

33. In the days and weeks leading up to the termination letter, ABA CDSV was able to carry out its mission and conduct its work as usual with regard to the OVW grants. The other ABA CDSV staff members and I engaged in regular communications with our OVW grant managers up to and including the date of termination, April 10, 2025. Our contacts at OVW did not state or suggest that ABA CDSV was not compliant with any of our grant awards, nor did they give us any reason to believe that the termination of any—let alone all—of our grants was imminent.

34. ABA CDSV held meetings or exchanged emails with the OVW grant managers reflective of our collaborative relationship nearly every day in the two weeks leading up to the grant terminations, including the day the grants were terminated.

35. On March 27, 2025, two ABA CDSV staff members and I met with the grant manager for our new LGBTQI+ coalitions grant, which was scheduled to start on April 1. Several ABA CDSV staff members exchanged multiple emails with OVW grant managers from March 27 through April 2, including to obtain approval on training materials and an award budget and to address an issue with uploading performance reports on DOJ's grants system, JustGrants.

36. On April 4, ABA CDSV received an email from OVW approving a conference request form we had submitted—a lengthy process—to hold a trauma-informed representation

11

training scheduled for May 14 during the Equal Justice Conference. On April 7, ABA CDSV received budget approval for one of our new projects, and an ABA CDSV staff member exchanged emails with a grant manager about the May 14 training. That day and the following day, a staff member and I exchanged emails with an OVW grant manager about an indirect cost rate agreement.

37. As recently as April 9, OVW had issued approvals for ABA CDSV materials on multiple projects. And on the morning of April 9, we had a meeting with an OVW grant manager regarding three of our grant awards. We discussed a number of items at that meeting, including our materials for upcoming trainings, requested changes to previously published materials, and the need to update the schedule for training institutes under one of our new awards to reflect a change in scope that OVW had already approved. We received multiple emails from that same grant manager that afternoon.

38. Throughout this period, we received no information or communication that suggested that ABA CDSV was in noncompliance on any of our grants.

39. On April 10, a staff member received notification from the DOJ grants system that one of our awards required an update, as well as an email from another OVW grantee, whom a grant manager directed to us.

40. Approximately one hour later, ABA CDSV received by email a letter from the OVW Deputy Director for Grants Management and Development, addressed to the ABA Director of Grant Operations and Compliance, notifying ABA CDSV that OVW was "hereby terminating the seven [ABA CDSV] awards to the American Bar Association." Ex. A. The letter stated that "[t]hese seven awards are being terminated because a Department review of them has concluded that they 'no longer effectuate[] the…agency priorities.' 2 C.F.R. § 200.340(a)(4)." The letter provided no additional explanation, nor did it provide any opportunity to appeal the termination decision. The

cancellation took effect immediately, and OVW "terminat[ed] all unobligated balances remaining on the seven above-referenced awards."

41. Although DOJ's termination letter purported to cancel seven grants, two of those grants had already ended, as of March 31, 2025.

42. In response to the news of the termination, ABA CDSV received dozens of personal emails from ABA CDSV partners expressing how devastating the loss will be for our partners and for survivors of domestic and sexual violence who require representation by legal professionals who have the knowledge and skills that we—and, in many cases, only we—provide.

43. In those responses, our partners recognized that the cancellations are "devastating," "heartbreaking," "disturbing," and "such a blow," especially "for the people who will miss out on this vital programming." They expressed that the ABA CDSV "team has always done a *fantastic* job with the trainings, whether live or virtual," and "program staff who have attended over the years have been overwhelmingly positive about the quality and relevance of the ABA CDSV Institutes." They praised ABA CDSV as "wonderful partners with whom to work in organizing the trainings," and who "have well-effectuated the priorities of the gender-based violence movement and survivors for a long time." An attorney at one partner organization shared that ABA CDSV's "work still effectuates [their] priorities, the priorities of [their] colleagues . . . , and the priorities of any individual who has actually known what it is like to not be prioritized this way." Another shared that ABA CDSV's "support has been invaluable to [their] agency." Another conveyed that they have "always been in awe of the caliber of people working with [ABA CDSV's] team and the fact that [ABA CDSV staff] choose to direct [their] talent and wisdom to this work and service is such a privilege for all of us in the field and across the country." Another expressed that ABA CDSV has "done such amazing and important work. I feel so grateful to have worked with you all on this project for the past 2+ years."

44. Our partners communicated gratitude for ABA CDSV's "support of these programs and of survivors"; for "the work [ABA CDSV does] to strengthen and scaffold" the domestic violence community; and for "being stalworth advocates for survivors and those who represent them." They wrote that the terminations are "a great loss to survivors, advocates, attorneys and so many more in this work." One stated, "We deeply value [ABA CDSV's] partnership and honor ABA CDSV's role as a leader in this moment; [ABA CDSV's] work is important and necessary." Many conveyed a wish to help and shared a hope for reinstatement of the grants and future collaboration.

45. Since ABA CDSV's grants were terminated, I have had multiple individual and group calls with our partners and others who work in the domestic and sexual violence field. I have also received numerous emails from others in the field. My understanding, based on those many conversations and messages, is that DOJ has not terminated any OVW grants other than those awarded to ABA CDSV. Indeed, DOJ has taken steps to assure other OVW award recipients that it is committed to the continuation of their projects.

46. On April 14, OVW emailed the FY2023 and FY2024 ELSI grant recipients, informing them that "[d]ue to a recent change in technical assistance funding, the ABA will no longer be the technical assistance provider for the ELSI grantees." OVW promised to "develop a new technical assistance plan for ELSI grantees" and "reiterate[d] that [OVW] is committed to the success of your projects and while technical assistance may look different moving forward, the grants management guidance for your projects will remain available and we will be continuing to connect with ELSI grantees individually and as a cohort."

**Devastating Effects of Grant Terminations on ABA CDSV's Operations and Projects**

47. As the dozens of email responses partially described above suggest, the termination of ABA CDSV's grants has immediate and devastating effects on ABA CDSV and its partners.

48. Most urgently, because our staff are primarily funded by the grants, ABA CDSV will have no choice but to lay off most or all of our staff members in the coming weeks absent funding. Assuming we receive the money owed for closeout costs, and after relying on all of our reserve funds, we will have to begin laying off ABA CDSV staff members within a few weeks, if not earlier, and we will have to let the majority of our staff go in about a month.

49. As a nonprofit organization, the ABA has no budgetary cushion or other source of funds available to save ABA CDSV, and its critical work, from this catastrophe. The ABA overall has lost nearly $69 million in obligated federal grant and cooperative-agreement funds. In addition, federal agencies also terminated or opted not to renew a number of federal contracts from which the ABA expected to continue to receive significant funding. Those losses of federal funding have resulted in the ABA's having to lay off more than 300 staff members and field officers across its programs. It could not reallocate funds for ABA CDSV without further reducing resources for other programs and, in turn, putting those programs at risk. And without these grants to ABA CDSV, this important aspect of ABA's work will be lost.

50. Plainly, without staff or funds, ABA CDSV cannot run trainings or provide assistance. Nearly 650 individuals have registered for ABA CDSV trainings that had been scheduled, but those—and all future trainings—will have to be cancelled if ABA CDSV's grants are not reinstated. Legal services providers working with survivors of domestic and sexual violence will have limited free opportunities to gain critical skills and access ad hoc support that they need to interact with and represent their clients effectively, ultimately impacting survivors. Without effective representation, lives will be damaged and lost.

51. ABA CDSV's partners will likewise be harmed in numerous ways. They will not receive the portion of the grant funds awarded to ABA CDSV that are earmarked for them in the grant awards. They cannot run these trainings without ABA CDSV, and they will no longer be able

to refer legal services providers to us for assistance. At least one of our partners, VRLC, has told me that it will likely have to lay off a staff member in the coming weeks as a result of the grant terminations.

52. The harm to our partnerships will in turn create irreparable harm to ABA CDSV's hard-earned reputation as a leader in this field and one of the most effective organizations to partner with on these issues. Notwithstanding ABA CDSV's unparalleled experience and expertise, if ABA CDSV's funding is not reinstated promptly, our partners will have no choice but to discontinue our previously positive and effective working relationships.

53. ABA CDSV is the only organization that exclusively does this type and scope of work nationwide. Any individual replacement organization would necessarily not be able to fill that gap adequately, at least not immediately. If ABA CDSV were to shutter, the resulting harms would therefore continue to ripple through legal services providers who rely on ABA CDSV's work to improve the services they provide to their clients.

54. The destruction of ABA CDSV's critical work would be devastating for legal services providers and, ultimately, survivors of domestic and sexual violence across the country.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of April 2025 in Houston, Texas.

_/s/_____
MARICARMEN GARZA

16

# EXHIBIT A



**U.S. Department of Justice**

Office on Violence Against Women

Washington, DC 20530

April 10, 2025

<u>BY FEDERAL EXPRESS DELIVERY AND E-MAIL TRANSMISSION</u>

Vladimir Gurin
Director, Grant Operations and Compliance
American Bar Association
1050 Connecticut Avenue, NW, Suite 400
Washington, DC 20036
vladimir.gurin@americanbar.org

Re:   Notice of Termination of OVW Training and Technical Assistance Award Nos. 15JOVW-21-GK-02238-MUMU, 15JOVW-22-GK-04003-MUMU, 15JOVW-22-GK-04001-MUMU, 15JOVW-22-GK-03984-STOP, 15JOVW-23-GK-05471-LEGA, 15JOVW-24-GK-03023-MUMU, and 15JOVW-24-GK-03022-STOP, Pursuant to 2 C.F.R. § 200.340(a)(4)

Dear Mr. Gurin:

I am writing to notify you that the Office on Violence Against Women (OVW) is hereby terminating the seven above-referenced awards to the American Bar Association (five of which were awarded to the American Bar Association d/b/a American Bar Association Fund for Justice and Education) (collectively "the ABA"), effective immediately.

As provided in the award, the Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. § 200.340(a)(4), as adopted and supplemented by the Department of Justice in 2 C.F.R. Part 2800, apply to these seven OVW discretionary awards. The award document for each of these awards provides notice of the applicability of the termination provisions in section 200.340.

These seven awards are being terminated because a Department review of them has concluded that they "no longer effectuate[] the…agency priorities." 2 C.F.R. § 200.340(a)(4).

OVW is terminating all unobligated balances remaining on the seven above-referenced awards. Consistent with this notice of termination and 2 C.F.R. § 200.343, OVW will not allow the use of award funds for obligations incurred, or expenditures made, after receipt of this notice.

This letter constitutes the notice of termination required by 2 C.F.R. § 200.341. As provided by 2 C.F.R. § 200.340(d), the ABA remains responsible for complying with closeout and other obligations set forth in 2 C.F.R. §§ 344 ("Closeout") and 200.345 ("Post-award closeout adjustments and continuing responsibilities").

Sincerely,

Ginger Baran Lyons
Deputy Director for Grants Management and Development
(Supervisory Official)

Cc: Lauren Nassikas, Principal Associate Director
Jennifer Kaplan, General Counsel
Erin Lorah, Associate Director