```
                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
AMERICAN BAR ASSOCIATION,
                                         CA No:  1:25-cv-01263-CRC
            Plaintiff,
                                         Washington, D.C.
                                         Thursday, April 24, 2025
 v.                                      3:03 p.m.

U.S. DEPARTMENT OF JUSTICE,
et al.,

            Defendants.
- - - - - - - - - - - - - - - x
_____

         TRANSCRIPT OF TEMPORARY RESTRAINING ORDER HEARING
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                    UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


For the Plaintiff:        **BRIAN D. NETTER, ESQ.**
                          **CHRISTINE COOGLE, ESQ.**
                          **DEMOCRACY FORWARD FOUNDATION**
                          PO Box 34553
                          Washington, DC 20043
                          (202) 448-9090


For the Defendant:        **ANDREW WARDEN, ESQ.**
                          **UNITED STATES DEPARTMENT OF JUSTICE**
                          950 Pennsylvania Avenue, N.W.
                          Washington, D.C.
                          (202) 914-2000


Court Reporter:              Lisa A. Moreira, RDR, CRR
                             Official Court Reporter
                             U.S. Courthouse, Room 6718
                             333 Constitution Avenue, NW
                             Washington, DC  20001
                             (202) 354-3187
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.
 3    We are on the record for Civil Case 25-1263, *American Bar*
 4    *Association v. The U.S. Department of Justice, et al.*
 5              Counsel, please identify yourselves for the record
 6    starting with the plaintiff.
 7              MR. NETTER:  Your Honor, my name is Brian Netter
 8    with Democracy Forward for the American Bar Association.
 9              THE COURT:  Okay.  Good to see you, Mr. Netter.
10              MR. NETTER:  Thank you, Your Honor.
11              MR. WARDEN:  Good afternoon, Your Honor; Andrew
12    Warden from the Department of Justice on behalf of the
13    defendants.
14              THE COURT:  Okay.  Good to see you as well.  Can
15    you all see and hear me okay?
16              MR. NETTER:  Yes, Your Honor.
17              THE COURT:  Okay.  Thanks for convening at such
18    short notice.  I figured I would get you folks together just
19    to talk about scheduling.
20              I've briefly skimmed the PI and TRO application.
21    I know that this was just filed this morning, but have you
22    all had an opportunity to talk about a potential schedule?
23              MR. NETTER:  We have not, Your Honor.  I think the
24    DOJ was, until a few minutes ago, figuring out who would be
25    handling this.
```

1     THE COURT:  Okay.  So I guess there's sort of two
2  possibilities.  One is to keep it on a PI/TRO track, or to
3  handle this as, you know, sort of as an expedited merits
4  matter.  The record doesn't look real large to me, but I did
5  note the allegations in the complaint and the TRO motion,
6  that there are some layoffs that may have to take place
7  within the next few weeks, whatever that may mean precisely.
8     So, Mr. Netter, do you want to start?  What are
9  your views?
10     MR. NETTER:  Sure, Your Honor.
11     So we filed the motion for a temporary restraining
12  order and preliminary injunction because the ABA is facing
13  this urgent need to keep these people employed and to keep
14  the Commission on Domestic and Sexual Violence open.  So we
15  do feel like there is a day-to-day imperative to get a
16  judicial determination as to whether the government's
17  actions are lawful or whether the relationship between the
18  ABA and the Office on Violence Against Women ought to be
19  resumed.
20     THE COURT:  Okay.  Mr. Warden, given that and
21  having read the allegations, particularly the harms alleged,
22  what makes sense, in your view, for an opposition date?
23     MR. WARDEN:  Thanks, Your Honor.
24     I think we'd like to set this down more on a
25  preliminary injunction track rather than an expedited TRO

1    track.  We were thinking our opposition would be due May
2    8th, and then plaintiffs could reply thereafter, and then
3    have a hearing potentially later that week.
4              I think we know just a couple of things.
5              We've only had about an hour to look at this, but
6    based on the complaint, it looks like what's at issue here
7    is about $3.2 million spread out over three years, which
8    roughly is about a million dollars a year.  You know,
9    compared to the ABA's operating budget of hundreds of
10   millions of dollars, it doesn't seem like this money would
11   cause an existential threat to the organization.
12             And I think the other thing that I think is
13   standing as a big obstacle here is the Court's jurisdiction.
14   The Supreme Court has recently, in the *Department of
15   Education v. California* case, issued a stay of a TRO in an
16   almost nearly identical posture where the Department of
17   Education suspended some grant money, and the Supreme Court
18   made it clear that those cases belong in the Court of
19   Federal Claims.  So I think we have some jurisdictional
20   issues.
21             So in light of those two factors, we'd ask for an
22   expedited but reasonable schedule to put papers together and
23   potentially decide this on a preliminary injunction track.
24             THE COURT:  Is that schedule acceptable to you,
25   Mr. Netter?

1           MR. NETTER: Sure. I think that that schedule
2   would be acceptable for resolution of the preliminary
3   injunction component of our motion.
4           We do think that the TRO warrants faster
5   consideration, you know, because there is this pretty
6   instant risk of needing to close the programs, which would,
7   you know, constitute serious irreparable harm.
8           THE COURT: Let's talk a little bit about that.
9           Mr. Warden sort of adverted to it, but I just did
10  a quick chart of the five grants that are at issue. All of
11  them are three-year grants.
12          The two largest ones were in the last fiscal year,
13  the last six months of the grant period.
14          The other two -- correct me if I'm wrong, but it
15  looks like one of them, the expanding legal services
16  initiative, we're about halfway through; and the other two
17  smaller ones, the LGBTQ ones, were about, it looks like, six
18  months into a three-year grant. So those are on the --
19  those still have some time left.
20          How do these grants work? These are all fiscal
21  year grants obviously. Does all of the funding come in at
22  the beginning of the fiscal year, and you get a new tranche
23  of money at the beginning of the next fiscal year?
24          Particularly for the two larger ones, why haven't
25  you received all of the money that you're going to receive

1   on those particular grants?  Educate me a little bit.
2              MR. NETTER:  So, Your Honor, it's a fair question.
3   As this is all developing very quickly, I'm not sure that I
4   have the precise details about when the money gets actually
5   disbursed to the ABA, but our understanding is that the
6   money has been paused such that it couldn't have been
7   released on an annual schedule.
8              THE COURT:  The question is whether all of it has
9   been paused.  And if some of these grants started back in
10  2022, and I assume that you've been paid and that -- or the
11  ABA's been paid and their staff has been compensated, and so
12  the question from a harm standpoint -- and correct me if I'm
13  wrong -- is how is what is left to be paid on those grants
14  going to affect the ABA's ability to pay salaries given that
15  some of these grants are very short term at this point and,
16  to Mr. Warden's point, that the ABA is obviously a much
17  larger organization?  And, you know, do these people do
18  other things for the ABA?
19             I mean, it seems like there are a lot of questions
20  in my mind as to the urgency with respect to at least that
21  alleged harm.
22             MR. NETTER:  Sure, Your Honor.
23             So as a structural matter, the way these grants
24  work is that the Commission on Domestic and Sexual Violence
25  spends the funds and then gets the money after the funds

1  have been spent.  They don't get the money up front with an
2  opportunity.  You have to dole it out during the course of
3  the fiscal year.
4          We submitted with the motion the Garza
5  declaration, which explains kind of how the expense and
6  obligation posture of the CDSV would play out the next
7  several weeks.  And, you know, that's factual evidence that
8  we really are at the point where, absent Court relief, the
9  ABA is going to have to let people go and start winding down
10 these programs.
11         THE COURT:  And, Mr. Warden, another point here is
12 that in addition to allegedly having to lay off folks and
13 ultimately shut down the commission, plaintiffs also allege
14 that there is a risk that unallocated funds will be
15 reallocated to different grant recipients, and I suppose
16 that could happen at any time.
17         And so, you know, Mr. Netter; is that fair?
18 That's one of the sort of exigencies that you've raised in
19 your application?
20         MR. NETTER:  It is, Your Honor.  There's a D.C.
21 Circuit case called *City of Houston v. HUD* that says
22 basically we have an obligation to come into court on an
23 emergency basis before such time as funds have been
24 reobligated, because if the funds are reobligated, then the
25 Court is going to lose some authority to do anything about

1    it.
2            THE COURT: It depends on how the grant program
3    actually works. I'm familiar with *City of Houston*.
4            But -- Mr. Warden, this may be a premature
5    question. I'm not sure you've had a chance to consult with
6    your clients, but would they agree not to reallocate any
7    funds until the Court is able to resolve the emergency
8    motions? That might affect the time -- the Court's view of
9    the timing issue.
10           MR. WARDEN: Thank you, Your Honor.
11           I don't have an answer to that question. We got
12   this case about an hour ago so we've not had a chance to
13   look into it, but that is something we can check on.
14           I do think -- and get back to the Court if that's
15   of interest to you. It would certainly impact the
16   scheduling here.
17           THE COURT: If you could file a notice as soon as
18   possible. By noon tomorrow?
19           MR. WARDEN: Okay.
20           THE COURT: Let me know whether these funds are at
21   risk of being diminished or given to somebody else so as to
22   moot the plaintiff's claim.
23           MR. WARDEN: Yes, Your Honor. Will do.
24           THE COURT: Okay. So I'll wait for that.
25           It strikes me that there is at least some urgency.

```
 1    I'm not sure what "within a few weeks" really means, but
 2    maybe not as much time as Mr. Warden has suggested.  But I
 3    don't think -- given the issue with, you know, recommitting
 4    the funds, putting that aside, this doesn't strike me as a
 5    matter of days kind of a TRO situation, but rather a matter
 6    of weeks.  And, you know, I'm committed to getting after it
 7    and to resolving the issues as soon as possible, but, you
 8    know, I think we're looking at a resolution within the next
 9    three or four weeks at the latest would be what I would
10    envision in terms of a schedule.
11              But let me wait to hear from Mr. Warden, and we
12    will go from there and enter a briefing schedule.
13              And I did notice, Mr. Netter, that you didn't
14    brief or anticipate the jurisdictional issue.  Obviously
15    that's out there, and, you know, I've dealt with *Bowen* and
16    Tucker Act jurisdiction before, and those are often tricky
17    issues.  And those have come out and interpreted *California*,
18    the recent Supreme Court's decisions, in different ways in
19    this Court, so that sometimes is not an easy proposition to
20    tackle.  So the Court would like as much time to do that as
21    possible.
22              Anything else, Counsel?
23              MR. NETTER:  Nothing from plaintiffs, Your Honor.
24              THE COURT:  Mr. Warden?
25              MR. WARDEN:  Nothing, Your Honor.  We'll get that
```

```
 1    notice to you before noon tomorrow.  Thank you.
 2              THE COURT:  Okay.  And then I will issue a
 3    scheduling order at that time.
 4              Good enough?
 5              MR. NETTER:  Great.
 6              THE COURT:  Thank you.
 7              MR. NETTER:  Thank you, Your Honor.
 8                  (Whereupon the hearing was
 9                   adjourned at 3:15 p.m.)
10
11            **CERTIFICATE OF OFFICIAL COURT REPORTER**
12
13              I, LISA A. MOREIRA, RDR, CRR, do hereby
14    certify that the above and foregoing constitutes a true and
15    accurate transcript of my stenographic notes and is a full,
16    true and complete transcript of the proceedings to the best
17    of my ability.
18        Dated this 24th day of April, 2025.
19
20
                                    /s/Lisa A. Moreira, RDR, CRR
21                                  Official Court Reporter
                                    United States Courthouse
22                                  Room 6718
                                    333 Constitution Avenue, NW
23                                  Washington, DC 20001
24
25
```