**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN BAR ASSOCIATION, | |
| *Plaintiff*, | |
| v. | Case No. 25-cv-1263-CRC |
| U.S. DEPARTMENT OF JUSTICE *et al.*, | |
| *Defendants.* | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR
TEMPORARY RESTRATINING ORDER OR, IN THE ALTERNATIVE,
PRELIMINARY INJUNCTION AND
RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

I.     The Court Should Enter a Preliminary Injunction ......................................................... 3

       A.     The ABA is likely to succeed on the merits of its First Amendment claims ................ 4

       B.     The ABA is likely to succeed on the merits of its APA claim ....................................... 7

              1.     This Court has jurisdiction to review the APA claim ........................................... 7

              2.     The grant terminations are not committed to agency discretion .................... 16

       C.     The ABA is suffering irreparable harm .......................................................................... 18

       D.     The equitable factors strongly favor emergency relief ................................................. 21

       E.     The Court should not require any bond ......................................................................... 22

II.    The Court Should Not Dismiss Any of the ABA's Claims ........................................... 24

       A.     Legal standards ................................................................................................................. 25

       B.     There is no basis to dismiss the due process claim ...................................................... 25

       C.     There is no basis to dismiss the equal-protection claim .............................................. 27

CONCLUSION ............................................................................................................................ 28

## INTRODUCTION

The American Bar Association (ABA) seeks emergency relief from this Court because the U.S. Department of Justice (DOJ), in disregard of the ABA's First Amendment rights, has unlawfully targeted the ABA in retaliation for the ABA's viewpoint and petitioning activities. As explained in the ABA's motion for emergency relief, DOJ issued a memorandum promising not to expend government funds in any way that might benefit the ABA because of the ABA's exercise of its rights to seek redress for grievances and to express its views. The next day, following through on that promise, DOJ abruptly terminated seven ABA grants from DOJ's Office on Violence Against Women (OVW).

One might have hoped that this abrupt termination was merely an error or misunderstanding with a justifiable explanation. But the government's opposition offers no such explanation and does not dispute the key facts giving rise to the ABA's retaliation claim. DOJ has cancelled no other OVW grants, and DOJ evidently does intend to continue funding similar services without the ABA. The thrust of DOJ's argument appears to be that the Constitution permits outright retaliation for the exercise of constitutional rights, and the government can wield its powers to punish those who seek redress from the courts, or who make statements in support of causes that do not align with the administration's views. The government's brief is thus a remarkable admission of retaliation against the ABA for its exercise of protected First Amendment rights. Long-settled constitutional principles and Supreme Court precedent prohibit DOJ's actions based on retaliatory animus and targeted discrimination.

None of DOJ's arguments in opposition to the ABA's motion for emergency relief excuse DOJ's disregard of the Constitution. Nor do they provide a basis for denying the ABA the relief it seeks. Most glaringly, by failing even to attempt to rebut the ABA's arguments in support of its First Amendment retaliation claim, DOJ has waived *any* argument regarding the ABA's likelihood of

success on that claim. As the ABA explained in its opening brief, it is likely to succeed on its retaliation claim, the ABA is suffering irreparable injury in multiple ways, and a preliminary injunction is in the public interest. Thus, the Court can grant the ABA's motion based on the retaliation claim alone.

As to the ABA's other First Amendment claims, DOJ argues that the ABA has failed to state a plausible claim for relief based on viewpoint discrimination and unconstitutional conditions—but DOJ relies on inapposite principles and virtually ignores the factual allegations underlying those claims. The ABA is likely to succeed on those claims as well for the reasons articulated in its motion.

On the ABA's claim under the Administrative Procedure Act (APA), DOJ makes no attempt to defend the terminations on the merits and instead contends that this Court cannot consider this claim. That is incorrect. This Court has jurisdiction over the APA claim because the ABA seeks relief other than money damages and the Tucker Act does not require the claim to be brought in the Court of Federal Claims, including because the ABA's grants do not involve the type of contract covered by the Tucker Act. And the termination of the ABA's grants is not committed to agency discretion by law, because DOJ's own regulations both cabin its actions and provide the Court with meaningful standards for evaluating those actions.

DOJ also declines to contest the ABA's due process claim on the merits and instead argues only that this Court lacks jurisdiction to consider it. Binding circuit precedent, which DOJ ignores, forecloses that contention. Finally, DOJ's argument that the ABA has failed to state an equal-protection claim falls short, because DOJ fails to acknowledge the undisputed factual allegations underlying that claim: the ABA is the only organization whose OVW grants were terminated, and the basis for its different treatment is the government's stated disagreement with viewpoints that the ABA has expressed through protected First Amendment activities.

Accordingly, the Court should enter a preliminary injunction blocking DOJ's unlawful termination of OVW grants awarded to the ABA Commission on Domestic & Sexual Violence (ABA CDSV) and requiring DOJ to immediately resume disbursing the funding obligated to the ABA. For similar reasons, the Court should likewise deny DOJ's motion to dismiss.

## ARGUMENT

### I.  The Court Should Enter a Preliminary Injunction

When ruling on a motion for preliminary relief, a court must apply the appropriate legal standards to the facts that could likely be established in more complete proceedings. With its motion for emergency relief, the ABA submitted evidence supporting its argument that DOJ's termination of the ABA CDSV grants was based on improper animus and viewpoint discrimination, lacked any reasonable explanation, and contravened governing regulations. In response, DOJ offers no evidence to suggest otherwise. DOJ presents only arguments for dismissal of most of the ABA's claims, with the exception of the ABA's retaliation claim. In so doing, in addition to waiving *any* argument contesting the ABA's likelihood of success on the retaliation claim, DOJ effectively concedes that, if the claims are not subject to dismissal, the ABA is likely to succeed on the merits. *See* Mem. in Supp. of Pl.'s Mot. for TRO or, in the Alternative, Prelim. Inj. (Pl.'s Mot.) at 11–21, ECF No. 4-1.[1]

---

[1] The government asks this Court to relieve it of any obligation to provide an administrative record in this case. Defs.' Mem. in Supp. of Mot. to Dismiss and in Opp'n to Pl.'s Mot. (Defs.' Br.) at 7 n.2, ECF No. 16-1. Although the ABA agrees that the Court can resolve the parties' pending motions without the administrative record, the ABA disputes that an administrative record is ultimately "not necessary for the court's decision" on the merits. *Id.* (internal quotation marks omitted). The government offers no justification for this conclusory assertion, and there is no basis for the Court to relieve the government of its obligation to produce a record in this case challenging final agency action.

### A.  The ABA is likely to succeed on the merits of its First Amendment claims

At its heart, this case seeks judicial relief for the government's targeted retaliation against the ABA, in violation of the ABA's First Amendment rights. DOJ does not dispute that this Court has jurisdiction to decide the ABA's First Amendment claims, arguing only that the ABA failed to state a plausible viewpoint-discrimination or unconstitutional-conditions claim. *See, e.g.*, Defs.' Br. at 21–23. And DOJ does not advance *any* argument that the ABA has failed to plead a plausible First Amendment retaliation claim, much less challenge the merits of that claim. *Compare* Pl.'s Mot. at 11–15 (showing that all elements of retaliation claim are met) *with* Defs.' Br. at 21–23 (addressing viewpoint-discrimination and unconstitutional-conditions allegations but ignoring retaliation claim).

As the ABA's motion explains, all three elements of a First Amendment retaliation claim are met here: (1) the ABA "engaged in protected conduct," namely speech and litigation adverse to the government; (2) the government's "retaliatory action"—the grant terminations—are unquestionably sufficiently adverse "to deter a person of ordinary firmness is [the ABA's] position from speaking again"; and (3) the ABA's protected "speech was the 'but for' cause of the defendants' retaliatory action," as expressly set out by Defendants themselves in the Blanche Memo. *Doe v. District of Columbia*, 796 F.3d 96, 106–07 (D.C. Cir. 2015) (internal quotation marks omitted); *see* Pl.'s Mot. at 11–15. DOJ's failure to dispute that the ABA is likely to succeed on the merits of its retaliation claim waives any defenses *See Lindsey v. District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012) (collecting cases) (applying the settled principle that arguments not made in opening brief are waived); *Vanda Pharms. Inc. v. FDA*, No. 23-2812, 2024 WL 4133623, at *15 (D.D.C. Sept. 10, 2024) (Cooper, J.) ("It is well understood in this Circuit that when a [respondent] files an opposition to a dispositive motion and addresses only certain arguments raised by the [movant], a court may treat those arguments that the [respondent] failed to address as conceded." (internal quotation marks omitted)).

DOJ's argument that the ABA's viewpoint-discrimination claim fails as a matter of law is unpersuasive. DOJ does not contest that the termination of the ABA's OVW grants was based on "the opinion or perspective of the [ABA]." *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Indeed, DOJ does not even attempt to dispute those factual allegations. This failure is unsurprising: the Blanche Memo—which the government largely ignores in its brief—expressly calls out specific viewpoints expressed by the ABA in litigation as the reason for DOJ's decision to cut off "taxpayer funds" from the ABA. *See* Memorandum from Deputy Att'y Gen. Todd Blanche to All Dep't Emps. at 1 & n.2 (Apr. 9, 2025), https://perma.cc/P6E7-B68K (Blanche Memo). DOJ also does not attempt to articulate a "compelling interest" that the termination is "narrowly tailored to achieve." *Reed*, 576 U.S. at 171.

Rather, DOJ contends that the viewpoint-discrimination claim should be dismissed because the government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." Defs.' Br. at 21 (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)). Based on this principle, DOJ argues that its decision "not to subsidize [the ABA's] legal positions is equivalent to a restriction on federal funding for 'abortion-related activities.'" *Id.* at 21–22 (quoting *Rust*, 500 U.S. at 178).

This argument completely misses the mark. The OVW grants were, in no sense, "subsidi[es]" of the ABA's "legal positions." *Id.* As explained in the complaint and preliminary-injunction motion, the terminated grants provide funding for training and technical assistance to legal practitioners and adjudicators who work with survivors of domestic and sexual violence. *See, e.g.*, Pl.'s Mot. at 3; Garza Decl. ¶ 6, ECF No. 4-2. None of the ABA's OVW grant-funded projects has involved the preparation or submission of briefs in litigation, let alone briefs advancing viewpoints that the government has called out as against the public interest in some way. Moreover,

in taking this stance, DOJ asks this Court for a dramatic, and unwarranted, expansion of the general principle that the government can choose not to fund speech it disfavors. The government's extraordinary position is that, if an organization ever engages in First Amendment activity that the administration disfavors, the government can discriminate against the organization on wholly unrelated issues. Such a position would permit the government to silence all manner of opposition.

The government's theory is wrong for another reason. There is, indeed, a constitutional doctrine that belies DOJ's interpretation of the First Amendment—the unconstitutional conditions doctrine. DOJ asserts that the government can "selectively fund certain programs" and "may place speech-restrictive conditions on participation in its programs if those conditions are confined to the scope of the program." Defs.' Br. at 22 (quoting *USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013), and *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 336 (D.C. Cir. 2018)). But the government may not "leverage funding to regulate speech outside the contours of the [federal] program itself." *USAID*, 897 U.S. at 214–15. That is precisely what DOJ has attempted to do here, by effectively creating a new condition on OVW grants that the grantee may not engage in speech or petitioning activity that the government disfavors. The "speech-restrictive conditions" here, *Archdiocese of Wash.*, 897 F.3d at 336—chilling the ABA from articulating viewpoints with which this administration disagrees—have nothing to do with the provision of training and technical assistance to legal services providers for survivors of domestic and sexual violence. The ABA is therefore likely to succeed on its unconstitutional-conditions claim.

Further, it is worth noting that DOJ states in passing that the Blanche Memo "did not purport to terminate any of [the ABA's] grants." Defs.' Br. at 22. But none of the ABA's claims require it to show that the memo itself terminated the ABA's grants. It is revealing that DOJ does not even attempt to deny that the Blanche Memo articulated the *reason* why DOJ terminated the ABA's grants—, in response to the ABA's protected speech and petitioning activities that the

government disfavors. The Blanche Memo specifically identifies certain "positions on contentious legal, policy, and social issues" that the ABA has taken and that DOJ views as contrary to "policy decisions" of this administration, as well as the fact that "the ABA filed a lawsuit against the United States." Blanche Memo at 1–2. Based on these protected First Amendment activities, the memo announces DOJ's new policy of cutting off any "taxpayer-funded resources" to the ABA. *Id.* These uncontested facts undergird all of the ABA's First Amendment claims, as to which the ABA is likely to succeed on the merits.

**B.  The ABA is likely to succeed on the merits of its APA claim**

On the claim that it engaged in final agency action that violates the APA, DOJ offers two unsuccessful defenses: a challenge to this Court's jurisdiction and a claim that grant terminations are so discretionary as to be unreviewable. Because neither defense succeeds, and for the reasons explained in the ABA's opening brief, Pl.'s Mot. at 16–21, the ABA is likely to succeed on the merits of its APA claim, as well.

**1.    This Court has jurisdiction to review the APA claim**

The government does not contest the merits of the ABA's claim that the grant terminations were arbitrary and capricious as well as contrary to the regulations governing when a grant may be terminated. Instead, the government's sole challenge to the APA claim is that this Court lacks jurisdiction because the federal government has not waived its sovereign immunity in district court from claims like the APA claim here. That challenge fails—this Court has jurisdiction over the ABA's APA claim.

Section 702 of the APA waives the government's immunity from claims against agencies and agency officials—and permits those claims to be brought in district court—so long as two requirements are met: (1) the claim "seek[s] relief other than money damages" and (2) no "other

statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Both requirements are satisfied here.

### a.  The ABA seeks relief other than money damages

DOJ does not appear to contest that the first requirement is met here, *i.e.*, that the ABA seeks "relief other than money damages." That is for good reason. It is true that the ABA's requested relief—an order declaring the grant terminations unlawful, setting them aside, and imposing injunctive relief blocking implementation of the terminations and requiring continued disbursements of funding under the grants, *see* Compl. at 29—should result in the government paying out grant money to ABA CDSV. But it is well established that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Rather, "money damages" are amounts "given to the plaintiff to *substitute* for a suffered loss," such as "injury to [the plaintiff's] person, property, or reputation." *Id.* at 893, 895. They "could be far greater than the amount withheld pursuant to the agency policy." *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, — F. Supp. 3d —, No. 25-cv-400, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025).

"Money damages" are distinct from "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Bowen*, 487 U.S. at 895 (internal quotation marks omitted). A court gives the plaintiff the very thing to which it is entitled where it "orders a defendant to pay a sum owed out of a specific *res*"—such as a particular appropriation. *City of Houston v. HUD*, 24 F.3d 1421, 1428 (D.C. Cir. 1994). Such an award "constitutes *specific relief*" available under section 702 of the APA, not "money damages." *Id.* Likewise, when an order requires disbursement of funds subject to the terms and conditions of an agreement—as opposed to a "free and clear transfer of money"—that "strings-attached

disbursement" is equitable relief, not money damages. *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318–19 (Fed. Cir. 2017).

Here, the full declaratory and injunctive relief sought would effectively require DOJ to pay money, but that money would both come with strings attached (all the terms and conditions of the grant awards) and be "the very thing to which" ABA CDSV is entitled, namely, the money appropriated for OVW grants and awarded to ABA CDSV. The ABA therefore seeks relief "other than money damages," and DOJ rightfully does not contend otherwise.

### b. The Tucker Act does not impliedly forbid seeking relief in district court

The government contends only that the ABA's APA claim does not meet the second requirement for section 702's sovereign-immunity waiver to apply because, in the government's view, the APA claim is a contract dispute covered by the Tucker Act, so the Tucker Act "impliedly forbids" district courts from considering that claim. The government is mistaken.

Where a claim is covered by the Tucker Act, section 702 of the APA "does not waive sovereign immunity" in district court. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). This is because the Tucker Act gives the Court of Federal Claims jurisdiction over claims "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Under D.C. Circuit precedent, this grant of jurisdiction to the Court of Federal Claims "provid[es] the exclusive remedy for contract claims against the government" and therefore "impliedly forbids" district courts from considering such claims.[2] *Transohio*, 967 F.2d at 609.

---

[2] There is reason to doubt this precedent because, as the Supreme Court has pointed out, no "language in the Tucker Act" makes the Court of Federal Claims' jurisdiction over contract claims "exclusive." *See Bowen*, 487 U.S. at 910 n.48. As the D.C. Circuit has itself recognized, there is a "strong case" that, in fact, "the Tucker Act should not be read to 'impliedly forbid'" district courts from considering "contract actions for specific relief." *Transohio*, 967 F.2d at 612. The ABA reserves the right to seek reconsideration of this precedent in an appropriate forum.

Here, the Tucker Act does not apply—and therefore does not deprive this Court of jurisdiction—for two independent reasons: (1) ABA CDSV's grant agreements are not the type of contract that can give rise to Tucker Act jurisdiction, and (2) even if they were, some parts of the APA claim that the ABA asserts are not contract claims.

**1.** The D.C. Circuit has made clear that a federal district court cannot "be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *accord Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023). After all, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle*, 446 F.3d at 177. Here, the Court of Federal Claims has no jurisdiction under the Tucker Act to consider claims related to ABA CDSV's grant awards because those awards, which are implemented through cooperative agreements between DOJ's OVW and ABA CDSV, are not the type of contract that can give rise to jurisdiction in the Court of Federal Claims.

For the Court of Federal Claims to have jurisdiction over a "contract" claim, the claim must be based on a contract that creates a right to money damages—and the cooperative grant agreements here create no such right. The Court of Federal Claims has jurisdiction under the Tucker Act only if the plaintiff "present[s] a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)). And to do that—and thereby to come within the "jurisdictional reach" of the Court of Federal Claims—the plaintiff must identify a "source of substantive law" that is "money-mandating" in the sense that it "creates the right to money damages." *Lummi Tribe*, 870 F.3d at 1317.

A contract can be such a money-mandating source of substantive law—but not all contracts are. *See, e.g.*, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (holding

that agreement there did "not provide a substantive right to recover money-damages" and that the Court of Federal Claims therefore lacked jurisdiction). For ordinary contracts, there is a "presumption that money damages are available" because "damages are the default remedy for breach of contract." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) (internal quotation marks omitted).

But that presumption does not hold for cooperative agreements. *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (holding that "damages cannot be implied" for a cooperative agreement). Unlike ordinary contracts, cooperative agreements are not used to "acquir[e] (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," but rather "to transfer a thing of value to the . . . recipient to carry out a public purpose of support or stimulation." 31 U.S.C. § 6305. Under cooperative agreements, the recipient generally must use the awarded funds for a specified public purpose and subject to various conditions. Given those distinct features of cooperative agreements, it is not fair to presume that money damages are available: money damages are a free-and-clear payment with no strings attached, so awarding them would circumvent the limitations of the cooperative agreement.[3] Thus, when a cooperative agreement is involved, jurisdiction lies in the Court of Federal Claims only if there is some affirmative indication that the agreement creates a right to money damages. *See St. Bernard*, 134 Fed. Cl. at 735.

Given these principles, ABA CDSV's grant agreements are not the type of contract that gives rise to Tucker Act jurisdiction: they are cooperative agreements that carry no presumption of a right to money damages, and there is no affirmative indication that they create such a right.

---

[3] In fact, the federal government is currently arguing to the Federal Circuit that a party who has not received grant funds to which it was entitled can never recover money damages—and that jurisdiction is not proper in the Court of Federal Claims—because that "would allow [it] to avoid the strings-attached nature of the award." *See* Opening Br. of Def.-Appellant at 30–33, *112 Genesee St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15.

Moreover, there can be no serious dispute that ABA CDSV's grant agreements are in fact cooperative agreements. In addition to being labeled "cooperative agreements," *see* Compiled Award Documents, ECF No. 16-3, the agreements provide money to ABA CDSV for it to carry out a public purpose—to train and support practitioners who work with survivors of domestic and sexual violence—and do not provide any "property or services for the direct benefit or use" of the government, 31 U.S.C. § 6305.

And these cooperative agreements provide no affirmative indication that money damages are available in the event of the government's breach. No provision of the agreements provides for damages. *See St. Bernard*, 134 Fed. Cl. at 735 (holding that cooperative agreement did not allow for money damages where no "specific provision in the agreement contemplat[ed] money damages for breach" by the federal agency). Nor is there any other basis to read the cooperative agreements as authorizing money damages in these circumstances. To the contrary, money damages would circumvent the many restrictions that the cooperative agreements impose on ABA CDSV's use of the funds, including the requirements that ABA CDSV use those funds for the public purposes for which they were intended and that it work in close cooperation with DOJ to carry out the programs. *See* ECF No. 16-3. In just this type of circumstance—where a grantee was required to spend awarded funds to carry out particular "collaborative projects" in cooperation with the granting agency—the Federal Circuit has held that a "simple money judgment" for damages would not be "appropriate" as it would circumvent the "restrictions governing the manner in which money may be . . . spent." *Nat'l Ctr. for Mfg. Sci. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997). For the same reason, the cooperative agreements here cannot be read to create the "right to money damages" needed to fall within the Tucker Act's "jurisdictional reach," *Lummi Tribe*, 870 F.3d at 1317.[4] In turn,

---

[4] The cooperative agreements here are different from the grant agreements that the Federal Circuit held fell within the Court of Federal Claims' jurisdiction in *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330 (Fed. Cir. 2021). In that case, a sub-grantee sued for breach of contract after a

because "the Claims Court lacks jurisdiction, the Tucker Act does not deprive this Court of jurisdiction." *Am. Near E.*, 703 F. Supp. 3d at 134 (citing *Tootle*, 446 F.3d at 176).

**2.** Even if ABA CDSV's grant awards were somehow read to create a right to money damages that could give rise to jurisdiction in the Court of Federal Claims under the Tucker Act, several parts of the ABA's APA claim would still not be subject to the Tucker Act because they are not contract claims. In particular, the APA claim is not subject to the Tucker Act at all insofar as it is based on DOJ's violation of the First Amendment, nor is any aspect of the APA claim insofar as it seeks invalidation of the unlawful termination of the grants as opposed to injunctive relief specifically requiring DOJ to continuing disbursing money under the grant agreements.

While the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over "contract claims against the government," the fact that a contract is involved is not enough to make a claim a "contract claim." *Transohio*, 967 F.2d at 609; *see, e.g.*, *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("explicitly reject[ing] the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act" (internal quotation marks omitted)). The question is whether the claims "are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Transohio*, 967 F.2d at 609 (emphasis added). A court must assess whether a claim is "in 'its essence'" contractual, which it does by looking to "'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought (or appropriate).'" *Perry Cap. LLC*, 864 F.3d at 619 (quoting *Megapulse, Inc.*

---

federal agency clawed back some disaster-assistance funds that the agency had already disbursed and that the sub-grantee had already spent on designated flood-mitigation projects. *Id.* at 1336-37. The Court of Federal Claims had jurisdiction because there—unlike here—there was no "continuing relationship between the parties," and the plaintiff sought only specific amounts that were "past due[] and designed to compensate for completed labors." *Id.* at 1351–52 (internal quotation marks omitted). In other words, because the work was already done, a no-strings-attached award would not circumvent the restrictions that applied to the grant initially. A grant may create a right to money damages in circumstances like that, but not in the circumstances here.

*v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Significant portions of the ABA's APA claims, at least, are not in their essence contractual under this test.

Start with the ABA's APA claim that the terminations were contrary to constitutional right and substantively arbitrary and capricious because DOJ effectuated them in violation of the ABA's First Amendment rights. Compl. ¶¶ 122, 125. The source of this right is the First Amendment of the Constitution, not the ABA's grant agreement with DOJ. The fact that DOJ "used [its] contracting powers as a means to retaliate" in violation of the ABA's First Amendment rights "does not transform [this] claim into one arising under or relating to [the] contract." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). The APA claim is not a contract claim at all insofar as it is based on DOJ's acting contrary to law and arbitrarily and capriciously in terminating the grants in violation of the First Amendment.

As for the other APA theories—that DOJ acted contrary to the federal financial assistance regulations and arbitrarily and capriciously by failing to adequately explain its reasons or consider reliance interests—they are not contract claims at their essence to the extent that they seek invalidation of the awards' termination, a declaration that the terminations were unlawful, and an injunction barring Defendants from enforcing or otherwise giving effect to the terminations (as opposed to an injunction specifically requiring Defendants to continue disbursing money pursuant to the grants). Where a claim seeks "the explicitly contractual remedy" of specific performance or the "prototypical contract remedy" of damages," that suggests the claim is contractual. *Perry Cap. LLC*, 864 F.3d at 619 (internal quotation marks omitted). But where a plaintiff seeks "non-monetary relief that has considerable value independent of any future potential for monetary relief," and not "negligible in comparison with the potential monetary recovery," those "claims do not fall within the

Tucker Act." *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995)

(internal quotation marks omitted); *see also Crowley*, 38 F.4th at 1107–08.

As an example, the D.C. Circuit has held that a plaintiff sought non-monetary relief with

considerable independent value where he sought an injunction requiring his military employer to

note that he received a medical, rather than general, discharge. *Kidwell*, 56 F.3d at 285–86. That could

potentially lead to monetary recovery (past disability benefits) but nonetheless had sufficient

independent value to fall outside the Tucker Act because it would "lift some of the shame associated

with failing to receive an honorable discharge." *Id.* Similarly, the Tucker Act did not apply to a claim

seeking an injunction barring a government agency from auditing payments owed to the plaintiff

under a contract. *Crowley*, 38 F.4th at 1113. Even though that could lead to receiving payments,

blocking the audits would provide considerable value to the plaintiff's "business operations and

professional reputation." *Id.* at 1111–12.

Likewise, here, the ABA's requested relief of declaring the grant terminations invalid, setting

them aside, and enjoining their implementation would provide "considerable value apart from . . .

any potential monetary recovery," *id.* at 1113, that could flow from that relief. The terminations did

not just cut off funding to ABA CDSV for its important programs; it also triggered closeout

obligations with which ABA CDSV must comply, including obligations to prepare and submit

various reports within a set timeframe, liquidate all financial obligations incurred under the award,

and account for property acquired with federal funds. 2 C.F.R. § 200.344(b), (c), (g). If ABA CDSV

does not meet those obligations, that will be reported to the central government award management

system and could potentially affect the ABA's eligibility for future awards. *See id.* § 200.344(i).

Declaring the termination unlawful and setting it aside, and enjoining Defendants from giving it

effect, would provide valuable, non-monetary relief by relieving the ABA from the obligation to

perform these tasks. That benefit to its "business operations" is considerable enough to bring this relief outside the scope of the Tucker Act. *See Crowley*, 38 F.4th at 1111.

### c. The emergency stay orders in *California* and *Widakuswara* do not affect this Court's jurisdiction

Despite those two independent reasons why the Tucker Act does not apply, the government attempts to escape this Court's jurisdiction by pointing to two emergency stay orders issued by higher courts. Neither helps its case. The government principally relies on the Supreme Court's terse emergency-docket stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025), to contend that district courts lack jurisdiction over APA claims like those here. But the Court in that case had no occasion to consider whether the grant agreements there were the type of contract that can give rise to Tucker Act jurisdiction or whether certain parts of the APA claim were not contractual—because no party raised those issues. Whatever precedential force a one-paragraph discussion in an emergency order issued without full briefing or a hearing might otherwise have, it cannot control issues that were not even presented to the Court. Likewise, the D.C. Circuit's emergency stay order in *Widakuswara v. Lake* does not control here because there, too, the court was not presented with the arguments that the ABA makes here. *See Widakuswara v. Lake*, Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1288817 (D.C. Cir. May 3, 2025), *pet. for en banc rehearing pending*.

### 2. The grant terminations are not committed to agency discretion

In its only other challenge to the APA claim, DOJ argues that its decision to terminate the ABA's funding is committed to agency discretion and thus not subject to APA review. Defs.' Br. at 15–17. DOJ's argument (which pertains only to the APA claims, and not the constitutional claims) fails. The narrow agency-discretion exception to judicial review applies only (1) "in those rare circumstances" where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," or (2) in "certain categories of administrative decisions that courts

traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (internal quotation marks omitted). Neither exception applies.

Contrary to DOJ's mischaracterization of the ABA's APA claim, the ABA does not challenge Defendants' "allocation of funds from a lump-sum appropriation." Defs.' Br. at 15–16 (quoting *Lincoln*, 508 U.S. at 192). Rather, the ABA challenges DOJ's retaliatory decision to terminate its funding for training and technical assistance to legal services providers for domestic violence and sexual assault survivors, in violation of DOJ's own regulations. DOJ's detailed regulations specify the legal ways in which DOJ can terminate the grants at issue. Pl.'s Mot. at 9. Pursuant to those regulations, DOJ can terminate a grant in only three circumstances: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). A change in agency priorities is a permissible basis for terminating a grant only if the terms and conditions of the award specify that as a ground for termination. Pl.'s Mot. at 9–10; Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (stating that terminations based on agency priorities were still permitted "[p]rovided that the language is included in the terms and condition of the award").

These regulatory parameters not only cabin DOJ's actions but also provide this Court with meaningful standards for evaluating those actions, making them subject to judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76–78 (D.D.C. 2018) (Jackson, J.). As the court concluded in *Policy & Research*, regulations that "expressly address—and limit—the agency's discretion to 'terminate' monetary awards" "provide meaningful standards for a court to employ when reviewing agency decisions under the APA." 313 F. Supp. 3d

at 76. Thus, when an agency's termination provisions apply, the agency's decision to terminate is not committed to agency discretion by law. *Id.* at 76–78; *Healthy Futures of Tex. v. HHS*, 315 F. Supp. 3d 339, 341 (D.D.C. 2018).

Nor does DOJ's decision to terminate the funds fall into a category of decision-making traditionally left to agency discretion. Although an agency's allocation of funds is in some circumstances traditionally committed to agency discretion, *Lincoln*, 508 U.S. at 192, as discussed, the ABA does not ask this Court to review the *initial allocation* of the funds at issue. Instead, the ABA asks for review of DOJ's unlawful *termination* of those funds. Evaluating regulatory termination provisions "involve[s] the type of legal analysis that courts routinely perform," not unreviewable agency discretion. *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-97, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) ("because the funds at issue here were already awarded . . . , more obligations apply," distinguishing government termination of funding from the unreviewable type of agency decision relating to "appropriated but not-yet-awarded funds").

Accordingly, DOJ's actions here are not committed to agency discretion and are subject to judicial review.

## C.  The ABA is suffering irreparable harm

DOJ attempts to contest that the ABA suffers irreparable harm by emphasizing that "there is no per se rule that a violation of freedom of expression *automatically* constitutes irreparable harm." Defs.' Br. at 27 (emphasis added) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006)). DOJ admits that this "abstract principle must be applied to the relevant factual setting," *id.* (quoting *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 123 (D.D.C. 2002)), but DOJ fails to apply it to the facts of this case. The ABA regularly engages in speech and petitioning activities, including filing briefs advancing viewpoints with which this

administration may not agree. The administration has now retaliated for some of those expressive exercises by suddenly terminating the ABA's OVW grants. Absent preliminary relief, both the challenged terminations and the potential for additional retaliatory actions would significantly impair the ABA's ability to speak and petition openly.

The challenged grant terminations are nothing like the situation in *Getty. Contra* Defs.' Br. at 27. There, a media organization alleged that the Department of Defense had excluded it from certain press pools and from Guantanamo Bay, but the allegations "were inaccurate," including because some pools in question "were not operational" and because a Getty representative was in fact flown to Guantanamo Bay. 193 F. Supp. 2d at 114–15. The *Getty* court found no irreparable injury because the "extent of the actual deprivation of Getty's First Amendment rights [was] thus entirely speculative," and indeed "cast[] some doubt" on Getty's standing. *Id.* at 123 & n.11. Here, by contrast, DOJ does not even contest the ABA's factual allegations, including that the Blanche Memo articulated the unconstitutional basis—retaliation and viewpoint discrimination based on the ABA's speech and petitioning activities—for the challenged terminations. Nothing about the ABA's resulting injury is "speculative." *Id.* at 123; *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." (internal quotation marks omitted)).

This case is also unlike cases in which plaintiffs allege First Amendment harm stemming from a generally applicable regulation or law. *See, e.g.*, *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1253 (D.C. Cir. 1991) (finding no irreparable injury where federal employees challenged a statutory "ban on honoraria" as violating "their First Amendment rights to make appearances, deliver speeches, and write articles for compensation"). The challenged government action here is targeted: it is personal to the ABA, and it is a direct response to the ABA's own speech. Therefore,

the ABA's "First Amendment interests [are] either threatened or in fact being impaired," which constitutes irreparable harm. *Id.* at 1254 (internal quotation marks omitted).

Moreover, the ABA will suffer additional, imminent irreparable injury directly from the abrupt termination of its OVW grants. DOJ attempts to downplay this harm as a "loss of funding, standing alone," that can easily be remediated. Defs.' Mot. at 26. As explained in the ABA's motion, however, ABA CDSV will have to begin laying off some of its staff in the coming days and will have to lay off most or all of its seven-person staff within a couple of weeks. Garza Decl. ¶ 48. The ABA does not receive OVW grant funding at the outset: it is reimbursed for its costs, including staff salaries and contractors' expenses, on a monthly basis. *See* Decl. of Vladimir Gurin ¶¶ 3, 7, 9. ABA CDSV, which was established at the same time as OVW following the passage of the Violence Against Women Act, is almost entirely dependent on funding from the grants that ABA CDSV exists to carry out. *See* Compl. ¶¶ 21–22, 39–42, 44; Pl.'s Mot. at 3. In other words, the ABA has demonstrated irreparable harm where "[t]he very purpose of [ABA CDSV's] existence and [its] business operations, including the financing for [its] projects, depends on [its OVW] grant money." *See Climate United Fund v. Citibank, N.A.*, — F. Supp. 3d —, No. 25-cv-698, 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025).

The grant terminations therefore threaten all of ABA CDSV's work and its "very existence." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see* Compl. ¶¶ 44–45; *see also, e.g., McGregor Printing Corp. v. Kemp,* No. 91-cv-3255, 1992 WL 118794, at *5 (D.D.C. May 14, 1992) (finding that "the irretrievable monetary loss to [plaintiff] in combination with the loss in employment to [plaintiff's] employees" amounted to irreparable harm). This is distinct from the harm alleged by the plaintiffs in *California*, because they—unlike ABA CDSV—"have the financial wherewithal to keep their programs running" without the terminated grant funding. 145 S. Ct. at 969. *Contra* Defs.' Br. at 27. The complete dissolution of ABA CDSV would be irreparable.

### D. The equitable factors strongly favor emergency relief

As the ABA explained in its motion, "government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). And here, the harm to the public interest extends to survivors of domestic and sexual violence, who depend on the expert services of trained legal professionals, who in turn rely on the kind of assistance that ABA CDSV provides in order to do their jobs well. *See* Pl.'s Mot. at 24. DOJ makes no mention of this serious harm, and its contrary arguments miss the mark.

First, DOJ suggests that denying relief is in the public interest because the administration and the ABA purportedly "do not see eye to eye." Defs.' Br. at 28. But, even if this were a weighty consideration in the public interest, the administration's disagreement with the ABA does not have any apparent connection to ABA CDSV's work or its relationship with OVW. Although DOJ repeats its pretextual desire to "better effectuate [OVW's] goals or priorities," it fails to identify a single way in which ABA CDSV or its programming diverged from OVW's goals or priorities. *Id.* Further, DOJ's suggestion that ABA CDSV and OVW do not have a "positive, ongoing relationship," *id.*, is belied by the unrebutted evidence of extensive, productive communication between ABA CDSV staff and OVW grant managers, not only over a period of decades but in the days and even hours leading up to the abrupt termination of all of the grants. *See* Garza Decl. ¶¶ 33–40.

Second, DOJ suggests that "other potential grantees" would be harmed by being "frozen out" from the funding that the ABA was awarded through the competitive open application process. Defs.' Br. at 29. But "potential grantees" do not have any entitlement to the ABA's grant funding— much less unidentified potential grantees who have not, presumably, even submitted an application for the already obligated funds under the terminated grants.

Finally, DOJ contends that a preliminary injunction would "undermine [its] contractual rights." *Id.* But the government has no right, contractual or otherwise, to violate an entity's constitutional rights. *Cf. Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)). DOJ also points to the Supreme Court's statement in *California* that the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. But that can hardly be construed as harm to the government or the public interest where, as here, the grant funds would be used by ABA CDSV for exactly the training and technical assistance programs that DOJ desires them to be used. *See, e.g.*, Pl.'s Mot. at 9, 23; Garza Decl. ¶¶ 45–46 (explaining that ABA CDSV's grants were the only OVW grants terminated, and OVW assured certain other grantees that it remains "committed to the success of [their] projects").

The balance of the equities thus weighs strongly in the ABA's favor.

### E.  The Court should not require any bond

This Court should not require the ABA to pay a bond, because the ABA seeks only to enjoin the government from unlawfully withholding funds that DOJ already committed to the ABA. Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As DOJ correctly notes, the D.C. Circuit has read the language "in such sum as the court deems proper" as "vest[ing] broad discretion in the district court" to require bonds. *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (internal quotation marks omitted); *accord* Defs.' Br. at 31. This includes the discretion "to require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation marks omitted). This discretion is especially pertinent here, where DOJ is unlawfully withholding "previously committed funds" and

thus "will personally face no monetary injury from the injunction"; a bond would merely "hold [the ABA] hostage" for the harm from the government's unlawful actions. *Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025). Requiring a bond would thus have the effect of denying the ABA its "right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Accordingly, courts in this district and across the country have declined to require plaintiffs to post bond in similar cases. *See, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *RFE/RL, Inc. v. Lake*, No. 1:25-cv-799, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025); *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025); *Colorado v. HHS*, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Woonasquatucket River*, 2025 WL 1116157, at *24.

If this Court were to require a bond, only a nominal bond would be warranted. "The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined." *Nat. Res. Def. Council*, 337 F. Supp. at 169. Where the harm to "the public interest will be far more gravely damaged" than any harm which could possibly result to the defendants, the requirement of a nominal bond suffices. *Id.* As discussed in the ABA's motion and above, *see supra* section I.D, the public interest in an injunction strongly outweighs any potential harm to the government from such relief. DOJ's constitutional violations do not harm only the ABA; they also harm the ABA's partners, the legal services providers that depend on ABA CDSV's work, and ultimately the domestic violence and sexual assault survivors who benefit from the ABA's work. Pl.'s Mot. at 25–26. The government, on the other hand, faces no harm from disbursing previously obligated funds to projects that benefit the public interest—particularly where DOJ, by its own admission, remains committed to the success of those projects. *Cf. Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see* Garza Decl. ¶ 46.

ABA CDSV has no other source of funding to replace its DOJ grants and faces grave, irreparable harm in the absence of injunctive relief. DOJ's contrary statements regarding the overall financial posture of the ABA reveal a significant misunderstanding of the organization and its finances. *See* Defs.' Br. at 31–32. The ABA is a nonprofit organization, meaning that it operates on a tight, detailed budget and generates no excess revenue beyond its operating expenses. *See* Garza Decl. ¶ 49. The ABA's grant-funded programs, such as ABA CDSV, are almost entirely grant-funded. *Id.* ¶¶ 11, 48. To make up ABA CDSV's losses would require the ABA to shift funds from one of its other programs, thereby creating a shortfall and causing harm to *those* programs. *Id.* ¶¶ 48–49. It is remarkable that the government is urging this Court to impose a significant bond when the ABA has already suffered the loss of significant other federal funding—including other terminated grants over which the ABA filed its earlier lawsuit against the government. *See* Garza Decl. ¶ 49; *Global Health Council v. Trump*, No. 1:25-cv-402 (D.D.C. filed Feb. 11, 2025).

At bottom, the ABA does not have the resources to continue ABA CDSV's functions without the grant money that DOJ unlawfully withdrew—and so it does not have the resources for a bond either. *Cf. Climate United Fund*, 2025 WL 1131412, at *21 ("Plaintiffs' funding is currently frozen because of Defendants' actions. They cannot access the very thing that has kept them running. Requiring a bond in this context makes little sense.").

## II.  The Court Should Not Dismiss Any of the ABA's Claims

As discussed above, in response to the ABA's motion for emergency relief, DOJ does not make any independent arguments on the merits; instead, it offers only reasons why certain of ABA's claims—but not the First Amendment retaliation claim—should be dismissed. For the reasons stated above, the claims on which the ABA sought emergency relief are not subject to dismissal; the ABA is, to the contrary, likely to succeed on the merits. Nor should the Court dismiss the claims on which the ABA did not seek emergency relief, *i.e.*, its due process and equal-protection claims.

### A.  Legal standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[T]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A motion under Rule 12(b)(1) "presents a threshold challenge to a court's jurisdiction." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (internal quotation marks omitted). The plaintiff "bears the burden of proving by a preponderance of the evidence that the Court has subject-matter jurisdiction over [its] claims." *Id.* When reviewing a challenge to its subject-matter jurisdiction, "the court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Id.* (quoting *Sandoval v. U.S. Dep't of Just.*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018)).

When reviewing a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), a court "must treat the complaint's factual allegations as true, and must grant plaintiff the 'benefit of all inferences that can be derived from the facts alleged.'" *Id.* (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).

### B.  There is no basis to dismiss the due process claim

There is no basis to dismiss the ABA's due process claim. DOJ's sole challenge to this claim is that it is "contractual in nature" and so "does not belong" in district court under the Tucker Act. Defs.' Br. at 17. This challenge overlooks binding circuit precedent holding that a due process claim like this is not subject to the Tucker Act and so can be brought in district court. In *Transohio*, financial regulators entered forbearance agreements with thrifts that made it easier for thrifts to meet minimum capital requirements. 967 F.2d at 600. Later, the relevant financial regulator decided it

would no longer honor those forbearance agreements and would impose stricter capital requirements. *Id.* Thrifts sued, arguing that the regulator had breached their forbearance agreements and that "the breach of that contract violated common law rules as well as the Constitution" because (among other reasons) it deprived them of their contractual right "without due process of law." *Id.* Assessing jurisdiction, the court concluded that while the Tucker Act required the "pure contract claims" to be brought in the Court of Federal Claims, "the district court properly exercised jurisdiction over" the thrifts' "due process . . . claims." *Id.* at 601, 609–11.

In reaching that conclusion, the court of appeals followed its earlier decision in *Sharp v. Weinberger*, 798 F.2d 1521 (D.C. Cir. 1986), which likewise held that a plaintiff's contract-related due process claim did not belong in the Court of Federal Claims under the Tucker Act. In particular, there, the D.C. Circuit held that the district court had jurisdiction to consider a reservist's claim that the government violated his due process rights by reassigning him despite an agreement that allegedly "contractually committed" the government to retain him in his current position. *Id.* at 1521–23. The *Transohio* court explained that the "lesson of *Sharp* . . . is straightforward": "[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610. Moreover, district courts have jurisdiction over a "constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Id.* That rule applies equally to due process claims, and those may be brought in district court even where they necessarily rest "on the premise that [a] contract with the government gave [the plaintiff] a constitutionally protected property interest." *Id.*

DOJ completely ignores this binding precedent and attempts to rely instead on various non-binding district court and out-of-circuit decisions. *See* Defs.' Br. at 17–20. In addition, DOJ contends that "[s]ome courts" have allowed due process claims to proceed in district court only because they

"misconstrue[d]" the law about when the Court of Federal Claims can hear constitutional claims. Defs.' Br. at 20. But DOJ is the one who is mistaken. DOJ points out that jurisdiction lies in the Court of Federal Claims for due process claims alleging illegal exactions. *Id.* (citing *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1363 (Fed. Cir. 2002)). But "[a]n illegal exaction claim must be based on property *taken* from the claimant, not property left *unawarded* to the claimant." *Lummi Tribe*, 870 F.3d at 1319 (emphases in original). The Court of Federal Claims does not have jurisdiction where a claimant challenges "the failure to disburse property that was never in the claimant's possession or control"—such as "grant funds to which [the claimant] is entitled" *Id.* at 1316, 1319. Here, the ABA does not claim that DOJ unlawfully took anything from it in violation of due process—and its due process claim accordingly properly belongs in district court.

### C.  There is no basis to dismiss the equal-protection claim

Finally, the government seeks dismissal of the ABA's equal-protection claim based on its incorrect assertion that the complaint "contains no factual allegations suggesting that [the ABA] has . . . been treated [differently] from similarly situated organizations." Defs.' Br. at 23. To the contrary, the complaint states plainly that "[a]lthough DOJ cited a purported change in 'agency priorities' as its justification" for terminating the ABA's OVW grants, "other OVW grants with similar aims were undisturbed." *See* Compl. ¶ 11; *see also id.* ¶ 107 ("The ABA's understanding is that DOJ has not cancelled any of the dozens of OVW grants awarded to other entities, and DOJ staff has indicated that at least part of ABA CDSV's work will continue in some form but without ABA CDSV's involvement."). DOJ attempts to sidestep this allegation by defining "similar situated organizations" according to the government's own decision-making—i.e., "organizations that have cooperative agreements with [OVW] and that," according to the government itself, "do not effectuate [OVW's] priorities." Defs.' Br. at 23–24. But defining similarly situated organizations

according to whether the government has also taken the complained-of action against them is circular and would essentially neutralize any "class of one" equal-protection claim.

The ABA has plausibly alleged that (1) it "has been intentionally treated differently from others similarly situated" because it is the only organization whose OVW grants were terminated (an allegation the government notably does not deny); and (2) "there is no rational basis for the difference in treatment," because the basis for the difference is the government's stated disagreement with viewpoints that the ABA has expressed through protected speech and petitioning activities. Compl. ¶ 105 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). The Court should therefore deny the motion to dismiss the ABA's equal-protection claim.

## CONCLUSION

For all these reasons, the Court should grant the ABA's motion and enter a preliminary injunction and deny the government's motion to dismiss, as set forth in the attached proposed order.

May 7, 2025

Respectfully submitted,

*/s/ Christine L. Coogle*
Christine L. Coogle (D.C. Bar No. 1738913)
Kristin Bateman (CA Bar No. 270913)^
Pooja A. Boisture (NY Bar No. 5104559)^^
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
ccoogle@democracyforward.org
kbateman@democracyforward.org
pboisture@democracyforward.org
bnetter@democracyforward.org
jmorse@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiff*

^ *Admitted only in California; practice supervised by members of the D.C. bar*
^^ *Admitted only in New York; practice supervised by members of the D.C. bar*